[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 7, 2008
THOMAS K. KAHN
CLERK

No. 07-13768

_____

D. C. Docket No. 00-01996-CV-SDM-TGW

RICHARD EARLE SHERE, JR.,

                                                    Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

                                                    Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 7, 2008)

Before TJOFLAT, BLACK and WILSON, Circuit Judges.

BLACK, Circuit Judge:

Richard Earle Shere, Jr., a Florida death row inmate, appeals the district court's denial of his petition for a writ of habeas corpus. During the penalty phase of Shere's state criminal trial, the prosecutor[1] made Biblical references on three separate occasions while cross-examining defense mitigation witnesses. Shere now contends his appellate counsel was ineffective for failing to raise a challenge to these Biblical references on direct appeal. After review, we affirm the district court's denial of Shere's habeas petition.

## I. BACKGROUND

Shere was convicted of first degree murder and sentenced to death for his role in the murder of Drew Snyder. The facts underlying Shere's conviction are set forth in the Florida Supreme Court's decision affirming his conviction and sentence and need not be repeated here. *See Shere v. State*, 579 So. 2d 86, 88-89 (Fla. 1991). For purposes of this appeal, what is relevant is what happened during the penalty phase of Shere's trial.

Shere called 14 witnesses to testify on his behalf during the penalty phase. He presented a mitigation theory based on his being a generally good and religious person, who had been hurt by his parents' divorce and who was more prone to lead

---

[1]There were two prosecutors involved in this case: Anthony Tatti and Bradley King. For convenience, we will not distinguish between them.

than to follow.  Of particular importance to this appeal are the direct and cross-examinations of three witnesses who discussed Shere's religious beliefs and practices:  Shere's sister, Deanne Judith Simpson; Shere's pastor, Rose Grindheim Sims; and Shere himself.  The relevant parts of their exchanges with defense counsel and the prosecutor are as follows:

*A. Deanne Judith Simpson*

*1. Direct Examination*

DEFENSE: Okay.  What do you know about Rick's religious beliefs and his faith in God?

SIMPSON: I know that he believes in God and I know that if he goes to the electric chair, he will be in heaven with me.

DEFENSE: Have you done any --

SIMPSON: But that won't happen because he's a good man and I love him to death.

DEFENSE: What have you done to try to bring him closer to God yourself?

SIMPSON: I've prayed with him a lot since I married him and Heidi to give their son a reputable name and a good life.

*2. Cross-Examination*

PROSECUTOR: Okay.  And you've described your brother as a religious man.  Is that right?  He believes in God?

SIMPSON: Yes.

PROSECUTOR: He believes in God's Law?

SIMPSON: He does now.

PROSECUTOR: Yes, ma'am. Do you know whether or not he's aware of the Ten Commandments, the commandment against taking another human life?

DEFENSE: I'm going to object to that, Your Honor. She can't say what he's aware of. It's irrelevant.

THE COURT: Objection sustained.

## B. Rose Grindhein Sims

### 1. Direct Examination

DEFENSE: What can you tell the jury about Rick's belief in God, about his religious faith?

SIMS: I first met Richard's grandmother when she came to our church, and then I called on her and then I called on Richard, Sr. And then he began bringing Richard to church with his wife, Pam.

. . . .

I probably have known Richard better than most other people have in the last three years because I've counseled with him over and over and over again. And when I counsel with him, I counsel that he accept Christ as his savior, and Richard did this. After a great struggle, both he and [his first wife] Pam accepted Christ.

And the day that they accepted Christ, Pam said, "Does this mean that I have to stay with Richard?" I said, "God isn't going to keep you out of heaven if you get a divorce. You have to try to make it work," but both he and Pam accepted Christ. And the second Sunday after that, I think, with great sincerity, both he and Pam came forward to profess their faith in Christ. He has never rejected that decision that he made. I baptized him.

. . . .

He was a brand new Christian. He was stumbling. He was growing. He was trying to do God's will and we shared together in many ways.

## 2. Cross-Examination

PROSECUTOR: Reverend Sims, you indicated earlier, I think, that you counseled with Rick --

SIMS: Yes.

PROSECUTOR: -- about Christ and his Christian faith. Is that correct?

SIMS: Yes, I sure did.

PROSECUTOR: And that was sometime prior to December of 1987. Is that correct?

SIMS: Yes, sir.

PROSECUTOR: And correct me if I'm wrong. I'm Baptist and I think basically we believe the same thing.

SIMS: I was a Baptist minister's wife for many years.

5

PROSECUTOR: When you counseled with him, you explained to him, did you not, that he has personal responsibility for his sins. Is that right?

SIMS: Absolutely.

PROSECUTOR: And that he is responsible before God and everybody else for the sins he's committed. Is that correct?

SIMS: Yes. That we confess them to Christ and he forgives them.

PROSECUTOR: And he understood that concept.

SIMS: He understood that one sin, but all of us have sinned. All of us have done things wrong.

PROSECUTOR: Absolutely. And the wages of sin is death.

SIMS: Exactly.

PROSECUTOR: Did you discuss with Rick, I'm sure, sins and the Ten Commandments, and that one of the sins is thou shall not kill or commit murder. Correct?

SIMS: Sir, I said to him that no sin that you commit or that anyone commits is any different, that God forgives all sins equally. That's why I said if they were divorced, God would not hold that sin any worse than any other sin.

PROSECUTOR: Right. But nonetheless, that is a sin, is it not?

SIMS: Each transgression is a sin.

PROSECUTOR: Okay.

6

SIMS:            Yours and mine.

PROSECUTOR:      Right.  So regardless of Christ's acceptance of him and Christ's forgiveness of him, --

SIMS:            Yes.

PROSECUTOR:      -- does not the [B]ible teach, I'm sure you explained to Rick, that regardless of that forgiveness, he still has personal responsibility for the act that he committed on Christmas of 1987.  Is that correct?

DEFENSE:         Objection.  That's been asked and answered, his personal responsibility.

THE COURT:       Objection overruled.

PROSECUTOR:      Is that correct, ma'am?

SIMS:            Sir, I have never said that he committed an act on Christmas Eve.

PROSECUTOR:      If this jury has found that he committed murder on Christmas, 1987, is he not, before God and everybody else, personally responsible for that act?

SIMS:            You're an attorney.

PROSECUTOR:      Ma'am, --

SIMS:            The law says that.  Right?

PROSECUTOR:      Is that correct?

SIMS: Each person is responsible for anything that we do.

PROSECUTOR: Right?

SIMS: Life does not hold us irresponsible just because you're a Christian.

PROSECUTOR: That's correct.

SIMS: And I'm not indicating that.

PROSECUTOR: Okay. I just want to make sure that we understand that we're talking about two different responsibilities.

SIMS: Absolutely. I understand that.

PROSECUTOR: Okay. Do you hold a personal belief about the death penalty?

SIMS: I don't believe that's the question here, and I don't think that that is --

PROSECUTOR: Ma'am, --

SIMS: Yes.

PROSECUTOR: -- I'm sorry. I don't mean to interrupt, but --

DEFENSE: Your Honor, I'm going to have to object to this question.

THE COURT: Objection overruled.

PROSECUTOR: Would you answer the question, please, ma'am?

8

SIMS: I don't believe that is the question here. I think there's a whole lot of difference between a Bundy and a boy like this.

PROSECUTOR: Your Honor, would you instruct the witness --

THE COURT: Ma'am, just answer the question. It calls for a yes or no, or if you feel like a yes or no is inadequate, then I'll let you explain it.

SIMS: I think a yes or no is inadequate.

THE COURT: Then you've got to say one or the other and then explain it.

SIMS: Okay. I believe that there are circumstances.

PROSECUTOR: Yes, ma'am.

SIMS: Right.

PROSECUTOR: Circumstances that would warrant a death penalty.

SIMS: Yes. When there is absolute evidence, when there are fingerprints, --

## C. Richard Shere, Jr.

### 1. Direct Examination

DEFENSE: I want you to tell me about your religious beliefs. I know it's hard for you and it's hard to testify here today, but tell the jury what are your religious beliefs. How do you feel about the Lord?

SHERE: Well, it's kind of hard growing up in a world of material things all your life and then having to

9

adapt to a spiritual world, but I'm very close to God and I'm starting to really understand him. In the last three years I've really took on a lot of what it's all about, you know, got a whole lot of understanding about what the Lord and the [B]ible is about. I've read a lot on it and I've proven to myself that the [B]ible is true and everything in it is true.

DEFENSE: Who's helped you come closer to God? Can you tell the jury what you've done, what kind of things you've done to work on your faith and become deeper in your faith?

SHERE: Well, in the last three years I've been involved in a lot of church activity and that's helped me out a lot because I like building things. My pastor has coached me through everything in the last three years, and I feel that she's helped me more than anybody as far as getting involved in that type of environment, and I've really liked it. It's been very beneficial to me.

DEFENSE: Would you like to have the opportunity to bring other people closer to God?

SHERE: Yes.

DEFENSE: How would you like to do that?

SHERE: I talk to people all the time, other inmates and stuff. I try to keep most everybody happy and out of trouble. I see a lot of bad people in there. I never thought there was that many bad people.

. . . .

10

DEFENSE: How often do you pray, Rick?

SHERE: I pray every morning when I wake up and every night before I go to sleep.

DEFENSE: How long have you been in the habit of praying every morning and every evening?

SHERE: Pretty much for the last seven months. Before that I prayed probably three times a week.

DEFENSE: Have you ever said a prayer for Drew Snyder?

SHERE: Yes, ma'am.

DEFENSE: Okay. Can you tell the jury about that?

SHERE: After his death I felt, you know, that I can't really say nothing bad about him, but I just felt that he wasn't saved, and I pray that the Lord will take that into consideration on his part. And I pray that he will be saved along with me and my family and everyone else.

*2. Cross-Examination*

PROSECUTOR: Okay. You talked quite a bit with your attorney about your religious beliefs and you indicated, I think, that you have strong feelings about the Lord and you've been saved. Is that true?

SHERE: Yes.

PROSECUTOR: I think you went on to say that you had been reading the [B]ible and learning about the laws that God said apply to your life. Is that true?

11

SHERE:        Yes, sir.

PROSECUTOR:   You know that one of those laws that God says
              applies to your life and everybody's life is one of
              the Ten Commandments, thou shalt not kill.  Is
              that correct?

SHERE:        Yes, sir.

PROSECUTOR:   Do you believe that applies to you, sir?

SHERE:        Yes, sir.  I believe that applies to everyone.

PROSECUTOR:   Right.  Also, a little bit further in that same book,
              Exodus Chapter 21, more laws are given to Moses
              for the people of Israel.  Part of those laws say that
              if a man lies in wait or premeditates the death of
              another man and by doing that kills him that the
              sentence is death.

DEFENSE:      Your honor, I'm going to have to object to this.

PROSECUTOR:   Do you agree with that?

THE COURT:    Objection sustained.

SHERE:        Yes, I believe --

PROSECUTOR:   Mr. Shere, you said that you said a prayer for
              Drew and that was after his death.  Is that right?

SHERE:        Yes, sir.

PROSECUTOR:   Did you do anything to give him a Christian burial
              on Christmas of 1987?

DEFENSE:      Object, Your Honor.

12

THE COURT:     Objection overruled.

SHERE:     He was buried in a really beautiful place and I said a prayer over the grave after I was forced to cover him up.

The jury returned a 7-5 recommendation in favor of the death penalty, which the court followed in sentencing Shere to death. Shere appealed his conviction and sentence on various grounds, but on direct appeal his appellate counsel raised no challenge to the Biblical references the prosecutor made during the penalty phase of the trial.

## II. STANDARD OF REVIEW

We review *de novo* the district court's denial of a habeas corpus petition. *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005). An ineffective assistance of counsel claim is a mixed question of law and fact, which we review *de novo. Id.*

Because Shere filed his federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), which "establishes a highly deferential standard for reviewing state court judgments." *McNair*, 416 F.3d at 1297 (citation omitted). Under AEDPA, a person in custody pursuant to the judgment of a state court is entitled to habeas relief only if the state court's

13

decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* (quoting 28 U.S.C. § 2254(d)).

## III.  DISCUSSION

Shere claims the prosecutor's Biblical references during cross-examination were improper and his appellate counsel should have challenged these references on direct appeal.  Because appellate counsel failed to raise such a challenge, Shere contends he received ineffective assistance.  A defendant can establish ineffective assistance of appellate counsel by showing:  (1) appellate counsel's performance was deficient, and (2) but for counsel's deficient performance he would have prevailed on appeal.  *Smith v. Robbins*, 528 U.S. 259, 285-86, 120 S. Ct. 746, 764 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984)).  For the reasons that follow, we conclude Shere has not carried his burden of proving he is entitled to habeas relief under AEDPA based on a claim of ineffective assistance.

Under AEDPA, Shere is entitled to federal habeas relief only if the Florida Supreme Court's resolution of his ineffective assistance of appellate counsel claim

14

is contrary to, or an unreasonable application of, clearly established federal law, as set forth by the United States Supreme Court.  28 U.S.C. § 2254(d).  Shere has not framed his claim in these terms.  However, even if we assume Shere properly framed his claim, we nonetheless conclude he has not carried his burden under AEDPA.

In denying Shere's ineffective assistance claim, the Florida Supreme Court suggested appellate counsel's performance was not deficient for two reasons. *Shere v. Moore*, 830 So. 2d 56, 59 (Fla. 2002).  First, appellate counsel could not have challenged many of the prosecutor's Biblical references because in many instances Shere's trial counsel failed to object.  *Id.*  Second, it was the defense that injected religion into the proceedings in the first place, so the prosecutor's exploring religion on cross-examination was not reversible error, and thus, no meritorious ground for appeal existed.  *Id.*

The Florida Supreme Court's decision is neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court law. Shere has identified no United States Supreme Court case holding appellate counsel rendered constitutionally deficient performance in a situation like that before us, *i.e.*, where appellate counsel failed to challenge a prosecutor's references to religion during the cross-examination of witnesses who had already

15

testified to religious matters on direct. Moreover, Shere has not identified any basis from which we can conclude the Florida Supreme Court unreasonably applied United States Supreme Court law when it denied his ineffective assistance claim. Thus, Shere is not entitled to habeas relief under AEDPA.

In his brief, Shere relies on our decision in *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001), to show the impropriety of the prosecutor's Biblical references. Shere's reliance on *Romine* is misplaced in the federal habeas context. As discussed above, under AEDPA, our review is limited to examining whether the highest state court's resolution of a petitioner's claim is contrary to, or an unreasonable application of, clearly established law, as set forth by the United States Supreme Court. 28 U.S.C. § 2254(d); *see also Newland v. Hall*, 527 F.3d 1162, 1199 (11th Cir. 2008). Thus, *Romine*, an Eleventh Circuit case, cannot form the basis of habeas relief under AEDPA.

Even if we were permitted to consider Eleventh Circuit law in resolving a habeas claim under AEDPA, the prosecutor's Biblical references in this case do not constitute error under *Romine*. That case involved the resentencing trial of Larry Romine, who had been convicted of murdering his parents. During the trial, Romine's grandfather appeared as a defense witness, and the prosecutor cross-examined him on whether he believed in the New Testament verse

16

commanding "honor your mother and father or be put to death." *Romine*, 253 F.3d at 1358-59. Then, at closing argument, the prosecutor gave the jurors "a hell fire and brimstone mini-sermon the effect of which was to tell them that regardless of the law of Georgia, they ought to follow the law of God." *Id.* at 1369. In the course of his closing, the prosecutor quoted various passages from the Bible, informed the jury it would simply be carrying out its duty by sentencing Romine to death, and admonished the jury not to ignore the Bible just because it was asked to apply state law. *See id.* at 1360-61. We determined the prosecutor's extensive reliance on religion during his closing argument was improper, noting it is error for a prosecutor to mislead a jury by quoting scripture for the proposition that a higher authority mandates death for murderers. *Id.* at 1368.

What Shere challenges is fundamentally different from what we held improper in *Romine*. There, we dealt with a prosecutor who unilaterally advanced Biblical arguments during closing to convince the jury the Bible required the death penalty. It was the prosecutor's closing arguments we found problematic, not his Biblical quotation during cross-examination. Unlike *Romine*, Shere does not contend the prosecutor made improper Biblical arguments to the jury during closing. Instead, Shere challenges the Biblical nature of the questions asked by the prosecutor during cross-examination. In *Romine*, the prosecutor asked a

17

defense witness whether he believed in the Biblical passage prescribing death for one who fails to honor his mother and father, and we acknowledged this, standing alone, was not constitutionally improper. *Id.* at 1358-59. The prosecutor's conduct in this case is nearly identical to that which we condoned in *Romine*.

Indeed, there is nothing inherently problematic with a prosecutor's asking religious questions while cross-examining defense witnesses who were put on the stand to testify about a capital defendant's religion, so long as the cross-examination does not exceed the scope of the religious subject matter explored on direct. Shere injected religion into the proceedings when he called witnesses to establish a mitigation defense based in part on religion, and he asked them fairly searching questions aimed at highlighting his religious beliefs and practices. Because the subject of religion was broadly addressed during direct examination, it was within the province of the prosecutor's authority to test that defense through cross-examination. In doing so, the prosecutor did not exceed the scope of the religious testimony with his questions; therefore, the prosecutor's Biblical references were valid cross-examination. Shere's appellate counsel did not have a meritorious issue to raise on appeal, so his failure to address the issue did not constitute deficient performance. *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (noting appellate counsel is not ineffective for failing to raise a

18

meritless issue on appeal). Thus, Shere's ineffective assistance of appellate counsel claim is without merit.[2]

In summary, Shere would not be entitled to habeas relief even if his claim were properly framed in terms of AEDPA. The Florida Supreme Court's denial of his ineffective assistance of appellate counsel claim is neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court law. Shere's reliance on *Romine* is misplaced, since under AEDPA our review of his habeas claim is limited to examining United States Supreme Court cases. Even if that were not the case, the prosecutor's Biblical references were within the scope of valid cross-examination under *Romine*, and thus Shere's appellate counsel did not perform deficiently in failing to challenge them on appeal.

## IV. CONCLUSION

For the foregoing reasons, we conclude the district court did not err in rejecting Shere's ineffective assistance of appellate counsel claim. The district court's order is

**AFFIRMED**.

---

[2] We also note Shere's trial counsel did not preserve a claim for appeal with regard to the Biblical references, and under almost identical facts to those before us, the Florida Supreme Court has held a prosecutor's Biblical questioning during cross-examination is not fundamental error. *See Farina v. State*, 937 So. 2d 612, 632 (Fla. 2006).