[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 9, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10393

_____

D. C. Docket No. 05-00021-CV-JTC-3

ROBERT L. MERIWETHER,

Petitioner-Appellant,

versus

BRUCE CHATMAN,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(September 9, 2008)**

Before HULL and WILSON, Circuit Judges, and EDENFIELD,[*] District Judge.

PER CURIAM:

---

[*]Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation.

Robert Lee Meriwether, a state prisoner serving a life sentence, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. Meriwether argues the state trial court required him to represent himself at trial in violation of his Sixth Amendment right to counsel. After review and oral argument, we conclude Meriwether validly waived his right to counsel and affirm.

## I.  State Trial Proceedings

In July 1999, Meriwether was indicted in Georgia state court on charges of making terroristic threats, kidnapping with bodily injury, battery, four counts of aggravated assault, and possession of a gun or knife during the commission of a crime. The primary victim was Melody Talley, Meriwether's girlfriend and mother of Meriwether's four children.

As detailed later, three eyewitnesses were cousins of Melody Talley and were with Talley when the kidnapping occurred. The three cousins recounted how Meriwether had a gun and pointed it at them, how Meriwether took Talley with him in his van, and how later that evening they saw Talley again at the hospital with a swollen mouth and bruised face. Talley and her three cousins each were victims in the four aggravated assault counts that charged Meriwether with pointing a gun at each of them. Talley was the sole victim in the charges against Meriwether of terroristic threats (for threatening to kill her), kidnapping with

2

bodily injury (for abducting her and hitting her in the face), and battery (for hitting her in the head and face).

A.    Pre-trial Events

John Rasnick was Meriwether's appointed counsel.  The record reflects Rasnick followed his standard procedure of having his paralegal interview Meriwether first and give him a document explaining court procedures, which included an instruction that Meriwether should contact Rasnick if released on bond.  Rasnick himself did not meet with Meriwether at the jail.  Rasnick tried to contact Melody Talley, but Meriwether had provided him incorrect contact information.

In August 1999, Rasnick received a letter from Meriwether indicating he did not want Rasnick to represent him and was planning to file a complaint against Rasnick with the State Bar.  On August 12, 1999, Rasnick responded to Meriwether with a letter stating he understood Meriwether was dissatisfied with Rasnick's representation and planned to report him to the State Bar.  Rasnick's letter stated that "[s]ince we are now adversaries I feel I can no longer represent you," that Meriwether needed to hire his own attorney if he did not want Rasnick to represent him, and that Meriwether should advise Rasnick as to whether he wanted Rasnick to continue as his lawyer.

On September 13, 1999, Rasnick sent Meriwether another letter stating he assumed he was still representing Meriwether because he had not heard otherwise. Rasnick's letter also indicated it was his opinion, after reviewing the evidence disclosed by the State, that there was "absolutely no way to win" Meriwether's case because (1) the State was going to use his 1990 prior felony conviction for shooting another person against him, (2) Melody Talley (the victim) had not yet come to Rasnick's office to give a statement on Meriwether's behalf and, in any event, the victim's prior statements to the police would be used against Meriwether, and (3) her cousins had given written statements and planned to testify against Meriwether at trial. Rasnick's letter advised Meriwether that it was his opinion that Meriwether would be convicted and receive a life sentence and thus should accept a plea bargain from the State if offered.

On September 17, 1999, Rasnick sent Meriwether a third letter stating he went to see Meriwether at the jail that day and learned Meriwether had been released on bond a month earlier. Rasnick's letter reminded Meriwether of the instruction sheet he had been given advising Meriwether to inform Rasnick if he was released on bond and to stay in contact with Rasnick to prepare for trial. Rasnick's letter stated he did not feel prepared to try Meriwether's case because Meriwether had not cooperated with him. Rasnick's letter scheduled a meeting

4

with Meriwether for September 23, 1999 at Rasnick's office and requested that Meriwether be on time and bring a list of potential witnesses and their contact information. Rasnick's letter stated that "If you do not show for your appointment and if you do not bring your witness list there is absolutely nothing I can do to help you." In addition, Rasnick's letter stated that Meriwether missed his arraignment in September, that a bench warrant may be issued for his arrest, and that the court may revoke his bond. Finally, Rasnick's letter informed Meriwether that his case was set for trial on October 4, 1999 and that "[t]his is a serious matter and I suggest that you govern yourself accordingly." Meriwether did not appear for the September 23 meeting at Rasnick's office.

B.    Trial Day One - Meriwether Rejects Appointed Counsel

On October 4, 1999, Meriwether and Rasnick both appeared in court for the scheduled trial date. Before voir dire, Meriwether told the state trial court, "I feel like I haven't been represented right." At this juncture, Meriwether did not advise the trial court of any specific complaints against Rasnick. Instead, he complained about how Deputy Sheriff Tim Moore had taken a statement from his "fiancé[e]," presumably Melody Talley,[1] while Meriwether was locked up on two charges, and then Moore had charged him with four counts of aggravated assault and

_____

[1]There is no indication elsewhere in the record that Meriwether and Talley were engaged.

5

kidnapping.  Meriwether added that Talley had spoken with Rasnick and the district attorney.  Meriwether said he told Deputy Sheriff Moore that he would only plead guilty to the charge he was guilty of.  Meriwether added though that "at that point in my life I had got strung out there on drugs."

The trial court told Meriwether to stop because anything he said could be used against him.  The court said it "was under the understanding from Mr. Rasnick that [Meriwether] did not want to use him.  That's all I want to talk to you about . . . ." The court then stated, "Let me just tell you this.  Mr. Rasnick is a very, very good lawyer.  He's tried many cases in the courtroom here.  He's won a number of cases.  You couldn't have a finer lawyer."

The trial court asked Meriwether when he was arrested.  After Meriwether advised he was arrested three months ago on July 4, the court told Meriwether it was now three months later, that Meriwether had had time to complain beforehand about Rasnick but had not done so, and at this late date he was going to have to use Rasnick as his attorney, as follows:

> So you've had plenty of time to make a decision on this.  It is now October the 4th, three months later; and now you're coming to court and saying you don't want to use him as your lawyer, and we're ready to go to trial; and we're going to try this case today, and you're going to have to use Mr. Rasnick.
>
> I'm sorry as I can be.  If you had come to us a month ago and said you were dissatisfied, maybe we could have made some

6

arrangements and let you hire a lawyer if you wanted to.

. . . .

> But at this late date we're not going to stop, do you understand, so you're going to have to do the best you can.

> He's good. He knows what he's doing. . . . We're going to go ahead with the trial of this case, and your best bet is to cooperate with him as much as possible and to help him as much as you can in the case.

Rasnick then stated he had "strongly urged" Meriwether to accept the State's "excellent" plea offer because it was in Meriwether's "best interest to accept the plea and not go to trial in this case." The trial court told Meriwether that he had a good lawyer who had advised him but that, of course, Meriwether did not have to take the offer and had a right to try his case to the jury. Meriwether insisted he wanted to go to trial. <u>Voir dire</u> proceeded,[2] and the jury was empaneled before lunch. It appeared Meriwether's problems with Rasnick had been resolved.

This proved not to be true. After <u>voir dire</u> and the lunch break, the trial court stated Meriwether had resumed his complaints about Rasnick and did not want Rasnick to represent him, but the case still should move forward that day, as follows:

> Again Mr. Meriwether, let me put on the record that Mr. Meriwether has now informed us that he doesn't want to use Mr. Rasnick. Of

---

[2]The <u>voir dire</u> is not transcribed.

course, he informed us earlier, but I had discussed this with him; and I thought we had an understanding that he was going to go ahead and use Mr. Rasnick . . . .

We discussed this before the beginning of the trial of the case. I informed him that Mr. Rasnick was a very good attorney in this county, tried numerous cases. He evidently still does not want his representation.

I informed Mr. Meriwether that we're moving ahead with the trial of the case right now. We've got a jury selected. [Meriwether has] had plenty of time to see another lawyer. He has had plenty of time to see Mr. Rasnick. He had been out of jail by his own testimony for four weeks. He was supposed to go see Mr. Rasnick immediately after getting out of jail. He did not bother to do that.

Meriwether then told the court that he had met Rasnick for the first time that day. The trial court replied that was Meriwether's own fault, not Rasnick's. The trial court asked Rasnick if he had investigated the case, looked at the file, and talked to witnesses. Rasnick responded that he had and was prepared to try the case that day. Rasnick added Meriwether was supposed to meet with him at 11:00 a.m. on the second floor after they picked the jury, but Rasnick waited for forty-five minutes and Meriwether never came.

The trial court explained to Meriwether that the case was proceeding to trial and that if he did not want Rasnick as his appointed counsel, then Meriwether would have to represent himself:

Court:          Mr. Meriwether, let me explain to you. We're going ahead with the trial of the case. It's always

8

very hard when somebody tries to represent them self [sic] because they do not understand–

Meriwether: I'm not going to represent myself.

Court: You're going to have to. You don't want him to. There's nobody else here that can. You're going to have to represent yourself.

We're moving ahead with the trial right now. We've got a jury picked. We're ready to go. We're moving ahead with trial.

I will explain to you some rules so that you'll understand what you have to do.

The trial court then discussed with Meriwether the different parts of a trial. The court explained how the State would make its opening statement first and tell the jury what the case was about. Meriwether then would have the opportunity to make an opening statement. The court explained to Meriwether that an opening statement "isn't some kind of rambling, just talk and talk and talk," but that Meriwether should tell the jury "exactly what you expect to be able to show in the way of the fact that you're not guilty."

The trial court asked Meriwether if he had any witnesses, and Meriwether responded, "myself." The court told Meriwether the State would present its case after opening statements, and Meriwether could cross-examine the State's witnesses. The court explained to Meriwether that cross-examination "doesn't

9

mean that you testify," but instead involves asking the witnesses questions. The court stated that after the State presented its case, Meriwether could take the stand himself and testify in his own defense. Meriwether interjected that he also would call Melody Talley as a witness. The State advised that she was a victim in the case. The court commented that the State apparently was planning to call Melody Talley as a witness and Meriwether could ask her questions when she testified.

The trial court explained to Meriwether that both sides would make a closing argument after Meriwether finished presenting his defense and Meriwether would make the last closing argument if he was the only defense witness. The court would read the law to the jury after closing arguments, and the jury would decide the case. The court asked Meriwether if he understood all of this, and Meriwether said he did.

The trial court asked if Meriwether had any questions. Meriwether responded that he was not familiar with some of the names on the State's witness list. Meriwether was told they were employees of the Sheriff's department when the incident occurred. The court asked Meriwether if he had any other questions, and Meriwether responded he did not.

The trial court then spoke with Meriwether's mother, who was in the courtroom. Meriwether's mother stated she had called Rasnick to schedule a

10

meeting for Meriwether, but she was told Rasnick was out of the country. Rasnick replied to the court he was only out of the country for two days during that time. The court again stated Meriwether had ample time to meet with Rasnick while on bond and the trial would proceed as scheduled with Rasnick serving as standby counsel for Meriwether. After the court explained to Meriwether what he would have to do if he represented himself, the court brought the jury into the courtroom to begin the trial. Meriwether proceeded to represent himself with Rasnick as standby counsel sitting at the table with Meriwether throughout the trial.

In its preliminary remarks to the jury, the trial court explained Meriwether would be representing himself, as follows:

> [W]e've run into an unusual situation although it does happen from time to time. Mr. Meriwether has decided that he doesn't want Mr. Rasnick to represent him. The Court has determined that he had plenty of opportunity to see Mr. Rasnick or to get another attorney, and I'm going to require that the case go forward which means that he's in the posture of having to represent himself. I would prefer that not to happen, but that's the posture we're in; and there's nothing we can do about it but move ahead. So Mr. Meriwether will be representing himself.

The court also explained to the jury that Rasnick would serve as standby counsel for Meriwether.

The trial then resumed. Meriwether made his opening statement. The State called as witnesses three of Melody Talley's cousins–Kim Talley, Trellis Renee

11

Blount, and Tiffany Owens–who were with Melody in a Ford Explorer when the incident occurred. All three witnesses testified they drove to a cookout together and parked. Meriwether pulled up behind them in a van and asked Melody to get out of the Explorer to talk to him. Melody exited and walked to the back of the Explorer with him. The three cousins heard Meriwether and Melody arguing and saw Meriwether start pushing her. At that point, they exited the Explorer. Meriwether then put his arm around Melody, pointed a sawed-off shotgun at them, and told them to get back. Melody's cousins got back in the Explorer, and Meriwether drove away with Melody in Meriwether's van. Melody's cousins called the police. Later that evening, they saw Melody at a hospital with a swollen mouth and bruised face.

The State attempted to admit a hearsay statement by Wisteria Daniel, a woman riding in Meriwether's van when he encountered Talley and her cousins, that was taken by Deputy Sheriff Barney Philpot. Meriwether objected to the admission of this hearsay statement, but the court allowed it. According to Philpot, Daniel said Meriwether told Melody Talley to get in his van and that he had a gun and would kill her because "he was tired of her turning tricks on him."

At the close of the State's case, the trial court advised Meriwether he had the right to testify and call other witnesses in his defense, but he would waive his right

12

to make the last closing argument if he called other witnesses. The court explained to Meriwether that he was under no obligation to present any witnesses or any other evidence because it was the State's burden to prove he was guilty. The court advised Meriwether that he did not have to testify and that the court would instruct the jury that they cannot hold it against him if he did not. Meriwether asked if it would be his witness if he brought back one of the State's witnesses, and the court told him it would not. The court also clarified that Melody Talley would be his witness if he called her to testify because the State had not called her.

The State suggested that the court advise Meriwether about making a motion for a directed verdict. The court explained to Meriwether that a directed verdict would mean the State had not carried its burden of proof on a claim. Meriwether moved for a directed verdict, and the court denied his motion.

Meriwether called Scottie Owens, Melody Talley's brother, who testified he saw Meriwether earlier in the day on July 4, 1999 with a gun in his van but did not know who owned it.

Meriwether also called Melody Talley. Talley testified she and Meriwether had been dating on and off for ten years and Meriwether generally did not put his hands on her, but he "got on drugs and started going downhill" when he lost his job in 1998. As to the July 4 incident, Talley testified Meriwether did not force her to

13

get out of the Explorer. Talley and Meriwether were just talking behind his van when her cousins got out of the Explorer and hollered that Meriwether had a gun. Talley testified Meriwether had his arm around her waist and was holding a gun, but did not point it at anyone. After she and Meriwether left in his van, Meriwether struck her twice in the mouth at some point while they were riding together, and Meriwether later took her to the hospital. On cross-examination, the State sought to impeach Talley with her prior statement, admitted to Deputy Sheriff Moore, that Meriwether pulled out a gun and put her into his van.

Meriwether also called himself as a witness, made a statement on his own behalf, and answered questions on cross-examination. Meriwether admitted that he had a gun with him when this incident occurred, that he got the gun out of the van when he saw Melody's cousins getting out of the Explorer, and that he hit Melody twice.

At the close of evidence, Meriwether moved for a directed verdict. The trial court granted Meriwether a directed verdict on three counts: (1) the aggravated assault charge regarding cousin Kim Talley because she never testified that she saw a gun or that Meriwether pointed a gun at her; (2) the aggravated assault charge regarding Melody Talley because there was no testimony that Meriwether pointed the gun at her; and (3) the terroristic threats charge because it was based

14

solely on Wisteria Daniel's hearsay statement. The court denied Meriwether's motion for a directed verdict on the remaining two aggravated assault charges regarding cousins Blount and Owens, the kidnapping with bodily injury and battery charges regarding Melody Talley, and the gun possession charge.

C.      Day Two of Trial - Additional Review of Rasnick's Representation

On the second day of trial, the trial court stated it wanted to "perfect the record" on the issue of Meriwether's waiver of his right to counsel. The court first summarized the events from the previous day of trial, as follows:

> Mr. Meriwether explained to me that he was not going to use Mr. Rasnick, that he had talked to somebody at the State Bar; and he could fire his lawyer any time.

> I told him that was correct, that he did not have to use him. He could fire him, but his only option was to either use Mr. Rasnick who had been appointed to him who was here, who stated on the record that he was prepared [to] go to trial and that–or he could represent himself, which he has a right to do.

> Mr. Meriwether elected to represent himself rather than use Mr. Rasnick, although he complained to me that he couldn't represent himself.

> I clearly explained to him that his two options were to either use Mr. Rasnick or represent himself, so we started the trial with him representing himself.

> Subsequent to all of that and after we had almost completed the trial, I found out there may be other information I think we need to put on the record concerning Mr. Rasnick's attempts to talk to Mr. Meriwether before the trial.

15

The court then asked Rasnick to detail his involvement in the case, and Rasnick recounted the various contacts he attempted to make with Meriwether before the trial date. As outlined above, although expressly instructed to contact Rasnick, Meriwether did not contact Rasnick after being released on bond and did not come to the September 23, 1999 meeting Rasnick scheduled before trial.

After this discussion, the trial court told Meriwether that he was handling himself pretty well in the courtroom and his skills in the courtroom showed he was smart enough to have advised the court earlier that he had a complaint about his attorney:

> It's obvious from your actions in the courtroom that you're fairly smart actually and have a pretty good idea. You're certainly not a lawyer, but you are handling yourself pretty well in the courtroom; and it looks like to me that if you didn't want to use him as your lawyer and you had let him know early on that you didn't want to use him as your lawyer that you were smart enough to contact the State Bar, make complaints, that you could have gotten you a lawyer or you could have contacted the Court early on and told the Court early on before we started the trial of this case.

The court concluded it was going to finish the trial that day.

Meriwether resumed his complaint that he did not choose to represent himself, as follows:

Meriwether:     I want the record to show that I did not decide to represent myself. I did not decide to represent myself.

| | |
|---|---|
| Court: | Well, you did because I told you you had two options. |
| Meriwether: | I was forced to represent myself. |
| Court: | You can put it that way if you like, but you put yourself in that position. I told you you could use Mr. Rasnick or you could represent yourself. Those were two choices. You did not want to use Mr. Rasnick. Therefore you chose to represent yourself. So you sit down, and we're fixing to finish the trial of this case. Okay? |

The court then brought the jury into the courtroom and allowed Meriwether to continue his cross-examination of the State's witnesses, even though both sides had rested the previous day. And again, Rasnick remained Meriwether's standby counsel throughout the trial.

### D. Motion for a Mistrial, Plea Discussions, and Verdict

Before closing arguments, Meriwether moved for a mistrial because he was not able to represent himself. The court denied a mistrial, explaining Rasnick was at Meriwether's table the entire trial and was ready and able to represent Meriwether, as follows:

> Well, we've gone over this several times, Mr. Meriwether. And again you're well-educated enough to know you should have gotten a lawyer. You had a very competent lawyer to represent you. That lawyer has sat at your table the whole time available if you needed him. He was there to represent you, was ready to represent you; and I won't grant your motion for mistrial, but it's on the record.

17

After the jury was charged, the court discussed with Meriwether the State's plea offer of a ten-year sentence, with three years in prison and seven years on probation, plus a five-year consecutive sentence on the firearm charge that also could be split between imprisonment and probation. The court explained to Meriwether that it was required to give him a life sentence if the jury found him guilty of the kidnapping with bodily injury charge, even though the court felt the facts of this case did not warrant such a sentence. Meriwether insisted he would not accept the State's plea offer.

The jury subsequently found Meriwether guilty on all five remaining counts. The court sentenced him to life imprisonment on the kidnapping with bodily injury count, twelve months on the battery count, and ten years for each of the two aggravated assault counts, all to be served concurrent, plus a consecutive five-year sentence on the count of firearm possession during the commission of a crime.

E.      Motion for a New Trial and Post-Judgment Motions Hearings

After the verdict and sentencing, the trial court appointed Robert Shuman to represent Meriwether. Shuman filed a motion for a new trial (raising five grounds) and a notice of appeal. Shuman amended the motion to add four more grounds, including a claim that the court erred in determining Meriwether voluntarily and knowingly waived his right to counsel and in forcing Meriwether to proceed pro

18

se.

On April 25, 2000, the trial court held a hearing on Meriwether's motion for a new trial. Meriwether was not present at the hearing, but he was represented by Shuman. Shuman stated he would proceed with evidence only on the ineffective-assistance-of-trial-counsel claim at that time and called Rasnick to testify. At the end of the hearing, the court denied Meriwether's motion for a new trial.

In the following months, Meriwether filed eighteen pro se motions in the trial court seeking various relief, including a mistrial. On November 13, 2000, the court held a hearing on these motions. Meriwether was present, and the court allowed him to explain his claim that Shuman was providing ineffective assistance of counsel and anything else regarding his pro se motions. Meriwether talked extensively about the case's history and his grievances with both attorneys appointed to represent him. At the end of the hearing, the court found Shuman had provided effective representation to Meriwether and denied all of Meriwether's post-judgment motions.

## II.    Direct Appeal

On direct appeal, Meriwether, through Shuman as counsel, claimed the trial court erred in determining he voluntarily and knowingly waived his right to counsel. In 2001, the Georgia Court of Appeals affirmed Meriwether's

convictions. Meriwether v. State, No. A01A2134 (Ga. Ct. App. Dec. 7, 2001)

(unpublished). After outlining the facts of the case, the Georgia Court of Appeals

concluded the trial court did not err in requiring Meriwether to choose between

going to trial with his appointed attorney Rasnick or representing himself, as

follows:

> As we have held, if a defendant lacks good reason for discharging his court-appointed attorney, the trial court does not err in requiring him to choose between representing himself and going to trial with his appointed attorney. Given the facts of this case, the trial court was authorized to conclude that Meriwether was attempting to use the discharge and employment of other counsel as a dilatory tactic, which was the functional equivalent of a knowing and voluntary waiver of appointed counsel. Consequently, the trial court did not err in denying Meriwether's request for a continuance and requiring that he proceed to trial pro se.

Id. at 3 (quotation marks and citations omitted).[3]

## III. State Habeas Corpus Petition

In 2002, Meriwether filed a pro se state habeas corpus petition raising six

claims, including that he was denied the right to counsel and did not voluntarily

and knowingly waive his right to counsel, both in violation of the Sixth and

Fourteenth Amendments. Meriwether argued any waiver of counsel was invalid

---

[3]In the district court and in its initial brief before this Court, the State did not raise any issue about whether Meriwether had fully exhausted his federal constitutional claim in state court. Thus, we do not consider that issue. See United States v. Levy, 416 F.3d 1273, 1275 (11th Cir. 2005).

20

because, inter alia, the trial court never advised him of the dangers and disadvantages of self-representation. The state court held a hearing on Meriwether's habeas petition. Meriwether and Shuman both testified, and their testimony primarily concerned the ineffective-assistance-of-appellate-counsel claims.

In 2004, the state court denied Meriwether's habeas petition. Specifically, the state court concluded, inter alia, Meriwether's right-to-counsel claims–that he was denied the right to counsel and did not voluntarily and knowingly waive his right to counsel–were litigated adversely to him on direct appeal and could not be relitigated in the state habeas proceedings. In 2005, the Supreme Court of Georgia denied him a certificate of probable cause to appeal the denial of his state habeas petition.[4]

## IV.    Section 2254 Petition

In 2005, Meriwether filed a timely pro se § 2254 petition, in which he argued the state trial court forced him to represent himself at trial and thereby denied him his right to counsel. Meriwether further contended his waiver of the right to counsel was not voluntary and knowing.

The magistrate judge's report ("R&R") recommended granting Meriwether's

---

[4]Meriwether filed another state habeas corpus petition in October 2004, but he eventually voluntarily dismissed it.

§ 2254 petition on the claim that the state trial court denied him his right to counsel. After receiving the State's objections to the R&R, the district court adopted the R&R's fact findings and conclusions, except to the extent it recommended granting Meriwether's § 2254 petition on the waiver-of-counsel claim. Applying AEDPA,[5] the district court determined the Georgia Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law because there was no Supreme Court precedent directly on point. The district court recognized that Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525 (1975), which established a defendant must be made aware of the dangers or disadvantages of self-representation before being allowed to proceed pro se, was the most relevant Supreme Court precedent, but emphasized that Meriwether "never explicitly asserted his right to represent himself."

The district court stated the record suggested Meriwether's actions in attempting to dismiss his appointed trial counsel were dilatory. The district court noted Meriwether was twenty-eight years old, a high school graduate, and demonstrated some knowledge of the law by contacting the State Bar about his appointed counsel, filing a complaint with the State Bar, indicating he was going to seek new counsel, and demonstrating he was aware of his right to discharge his

_____

[5]The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).

appointed counsel. Further, Meriwether was released on bond for at least four weeks before trial and made no effort to contact or respond to his appointed counsel Rasnick, obtain substitute counsel, or inform the trial court of his dissatisfaction with Rasnick. The court determined the Supreme Court had given courts leeway in dealing with dilatory practices by defendants and the state courts' actions and decisions here were not unreasonable. The court sustained the State's objections and denied Meriwether's § 2254 petition.

Meriwether timely appealed. The district court granted a certificate of appealability as to "[w]hether the state trial court violated Petitioner's Sixth Amendment rights by finding that Petitioner, based on his actions before and during trial, effectively waived his right to counsel by requiring him to choose between representing himself or proceeding with his appointed counsel."

## IV. Discussion

Before discussing Meriwether's case, we review this Court's two recent en banc decisions about waivers of the right to counsel. Both cases involved similar factual scenarios where a criminal defendant sought to discharge competent, appointed counsel on the eve of trial, was given the choice of proceeding either with appointed counsel or pro se, and was found to have voluntarily and knowingly waived counsel by refusing to proceed with appointed counsel.

23

A.    *United States v. Garey*

In United States v. Garey, __ F.3d __, No. 05-14631, 2008 WL 3850284
(11th Cir. Aug. 20, 2008) (en banc), a federal criminal defendant claimed on direct
appeal that the district court violated his Sixth Amendment right to counsel by
requiring him to represent himself at trial.  The defendant moved to dismiss his
appointed counsel (Scott Huggins) three days before trial based on an alleged
conflict of interest.  Id. at *2.  After determining no conflict existed, the district
court informed Garey it would not appoint a new lawyer for him and Garey had to
decide between proceeding with appointed counsel or pro se.  Id. at *2-3.  The
district court reviewed the sentence Garey faced, explained the disadvantages of
self-representation, and advised Garey to proceed with Huggins as counsel.  Id. at
*3, *12.  Garey insisted he would not allow Huggins to represent him, but stated he
was not voluntarily waiving his right to counsel and never affirmatively chose self-
representation.  Id. at *5-6, *12.  The district court interpreted Garey's
uncooperative behavior as a voluntary and knowing waiver of his right to counsel.
Id. at *4.  Garey ultimately represented himself at trial, with Huggins remaining as
standby counsel.  Id. at *6.  The jury found Garey guilty, and the court sentenced
him.  Id.

On appeal, Garey contended the district court violated his Sixth Amendment

right to counsel by requiring him to represent himself when he had not made an affirmative request to do so. Id. A divided panel of this Court agreed and reversed Garey's conviction. See United States v. Garey, 483 F.3d 1159 (11th Cir. 2007). This Court granted en banc review and affirmed Garey's convictions.

The en banc Garey Court stated it is well-established that a defendant may waive his right to counsel when he does so voluntarily and knowingly, but the means by which he may do so are less clear. Garey, __ F.3d __, 2008 WL 3850284, at *6. The Court noted Faretta "recognized the right to self-representation in the context of deciding whether a defendant who had asked to represent himself and had demonstrated a rudimentary knowledge of legal procedure was entitled to proceed pro se." Id. However, "Faretta's discussion of the right to self-representation presupposed a cooperative defendant willing to engage in reciprocal dialogue with the court" and "[t]he Supreme Court has never confronted a case in which an uncooperative defendant has refused to accept appointed counsel or engage in a colloquy with the court." Id. at *7 (emphasis added). Thus, the Supreme Court had never been asked to determine the issue presented in Garey of "whether a defendant may waive counsel without making an explicit, unqualified request to represent himself." Id.

The en banc Court explained that the problem with treating the express,

25

affirmative request for self-representation discussed in <u>Faretta</u> as the exclusive means by which a defendant may waive the right to counsel is that "it forces judges to ignore words, actions, and circumstances relevant to the Sixth Amendment inquiry," such as when a defendant makes "repeated, unequivocal statements rejecting his lawyer even though he knew the court would not appoint another lawyer to represent him." <u>Id.</u> at *8. Thus, the <u>Garey</u> Court concluded "<u>it is possible for a valid waiver of counsel to occur</u> not only when a cooperative defendant affirmatively invokes his right to self-representation, but also <u>when an uncooperative defendant rejects the only counsel to which he is constitutionally entitled</u>, understanding his only alternative is self-representation with its many attendant dangers." <u>Id.</u> (emphasis added). The Court further stated "when an indigent defendant rejects competent, conflict-free counsel, he may waive his right to counsel by his uncooperative conduct, so long as his decision is made with knowledge of his options and the consequences of his choice." <u>Id.</u> at *9. Turning to Garey's case, the Court concluded that "[b]y rejecting appointed counsel, Garey <u>voluntarily</u> chose to proceed pro se as surely as if he had made an affirmative request to do so" and that "Garey <u>voluntarily</u> waived his right to counsel by his conduct." <u>Id.</u> at *12 (emphasis added).

In addition to being voluntary, the <u>Garey</u> Court explained a waiver of

26

counsel also must be knowing. Id. The Garey Court cited Supreme Court precedent establishing that a waiver of the right to counsel must be a knowing act done with sufficient awareness of the relevant circumstances and that whether a waiver was knowingly made depends upon the particular facts and circumstances of the case, including the background, experience, and conduct of the accused. Id. at *9. The Court recognized Faretta established that "[b]efore a court concludes a defendant has knowingly waived his right to counsel, the defendant 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.'" Id. at *10 (quoting Faretta, 422 U.S. at 835, 95 S. Ct. at 2541). "To that end, the best practice is for district courts to begin by attempting to engage the defendant in a full discussion of the dangers of self-representation . . . ." Id. But when a defendant is not willing to engage in such a dialogue, the district court may discharge counsel so long as it is assured that the defendant understands the choices before him and knows the potential dangers of proceeding pro se. Id. The Court concluded Garey's waiver was knowing because the district court explained to Garey, "clearly and repeatedly, what his constitutional choices were and what dangers lay along the path of self-representation" and the record showed Garey understood his choices. Id.

B.      *Jones v. Walker*

Jones v. Walker, __ F.3d __, No. 04-13562, 2008 WL 3853313 (11th Cir. Aug. 20, 2008) (en banc), presented a similar Sixth Amendment waiver-of-counsel issue, but in the procedural posture of a state prisoner seeking habeas corpus relief through § 2254.  The defendant Jones was unsatisfied with his appointed counsel (Claudia Saari) and moved to dismiss her as counsel nearly two months before trial.  Id. at *1.  The state trial court denied the motion.  Id.  At a hearing two weeks before trial, Jones continued to express his dissatisfaction with counsel Saari.  See id. at *2-3.  The state trial court stated Saari was a fine, experienced lawyer and Jones would either proceed with Saari as counsel or represent himself.  Id. at *2.  Jones insisted he was not waiving his right to counsel, but he did not want to proceed with Saari or pro se.  Id.  After the dialogue continued in this manner, the trial court discharged Saari as Jones's counsel and continued the trial date.  Id. at *3.

Before trial, Jones informed the state trial court he had reconciled with Saari and wanted her to represent him.  Id.  The trial court reappointed Saari as Jones's counsel and continued the trial.  Id.  As the trial date approached, Jones again complained about Saari's representation.  Id.  The trial court held another hearing and presented Jones with the options of proceeding pro se or with Saari as counsel.

28

Id. at *4. Jones insisted he did not want Saari, but was not waiving his right to counsel or choosing to proceed pro se. Id. The trial court eventually discharged Saari as Jones's counsel. Id. Jones represented himself at trial, the jury convicted him, and the trial court sentenced him to life imprisonment. Id. at *4-5.

On direct appeal, the Georgia Supreme Court affirmed Jones's convictions based, in part, on a finding that Saari "'testified that she made Jones fully aware of the nature of the charge, the possible sentences, and the dangers of self-representation.'" Id. at *8 (quoting Jones v. State, 536 S.E.2d 511, 513 (Ga. 2000)). The state courts denied Jones's requests for post-conviction relief. Id.

The district court denied Jones's § 2254 petition. Id. However, a panel of this Court concluded Jones's Sixth Amendment rights were violated because he had not clearly and unequivocally asserted his desire to waive counsel and proceed pro se. Jones v. Walker, 496 F.3d 1216 (11th Cir. 2007). This Court granted en banc review.

The en banc Jones Court, relying on Garey, concluded Jones could not show the state court's decision was contrary to, or an unreasonable application of, federal law, as required by § 2254(d)(1), "because the Supreme Court has never confronted a Sixth Amendment challenge involving a defendant who rejects his appointed counsel without good cause." Jones, __ F.3d __, 2008 WL 3853313, at

29

*10. However, the Court, like the panel of this Court, concluded Jones had satisfied § 2254(d)(2) by showing the Georgia Supreme Court's decision on direct appeal unreasonably determined the facts because the record demonstrated Jones's counsel Saari never testified about whether she warned Jones of the dangers of self-representation. Id. at *10 & n.5. Thus, the Court reviewed the case de novo without deferring to the state court's decision. Id.

After discussing Garey, the Court concluded Jones's conduct was "even less cooperative and more dilatory" than Garey's. Id. at *12. Jones understood he was entitled to one attorney, Saari, but he rejected Saari's assistance and said he did not want her to represent him. Id. The Court concluded the state court did not err in determining Jones "voluntarily chose to proceed pro se as surely as if he had made an affirmative request to do so, and therefore voluntarily waived his right to counsel by his conduct." Id. (emphasis added) (quotation marks omitted).

The issue of whether Jones knowingly waived his right to counsel diverged from Garey because neither the trial court nor counsel warned Jones on the record about the dangers and disadvantages of proceeding pro se. Id. at *13. But unlike the defendant's direct appeal in Garey, defendant Jones was petitioning for habeas corpus relief and bore the burden of proving by a preponderance of the evidence his waiver of counsel was not knowingly made. Id. at *14. "To meet his burden,

30

Jones was required to point to evidence in the record from which a trier of fact could reasonably conclude Jones did not understand the dangers of self-representation at the time he waived his right to counsel." Id.

The Jones Court concluded Jones had failed to meet this burden. Id. First, the en banc Court rejected the suggestion that the lack of on-the-record warnings of the dangers and disadvantages of self-representation was dispositive of whether Jones's waiver was knowingly made. See id. Based on prior precedent, the Court stated that a lack of on-the-record warnings by the trial court is not conclusive proof that a defendant's waiver of counsel was unknowingly made and does not always lead to reversal. Id. Trial court warnings "are a means to the end of ensuring defendants do not waive fundamental constitutional rights without an adequate understanding of the consequences of their choices." Id. However, the "ultimate test of whether a defendant's choice is knowing is not the adequacy of the trial court's warning but the defendant's understanding." Id. at *14 (quotation marks omitted). "So long as a defendant knows the risks associated with self-representation, it is irrelevant for constitutional purposes whether his understanding comes from a colloquy with the trial court, a conversation with his counsel, or his own research or experience." Id. at *15.

Thus, because counsel Saari never testified she warned Jones (as the Georgia

31

courts found), the Court, using de novo review, scrutinized the record to determine whether it supported a finding that Jones knowingly waived his right to counsel. Id. at *15-17. In doing so, the Court examined a variety of factors, such as the defendant's background, experience, and conduct; his knowledge of the nature of the charges, the possible defenses, and the possible penalties; and whether the defendant was trying to manipulate the events of the trial. Id.

Several factors suggested Jones's waiver was not knowingly made, such as: (1) his age (twenty-one years old at the time of his indictment); (2) his minimal experience with the criminal justice system (one prior conviction based on a plea); (3) his lack of prior trial experience; (4) the lack of standby counsel; and (5) the lack of on-the-record warnings of the dangers of self-representation. Id. at *17. Nevertheless, several facts suggested Jones's waiver was knowingly made, such as: (1) he was not mentally ill; (2) he understood the nature of the charges against him; (3) he was aware of the possible penalties he faced upon conviction; (4) he had the opportunity to consult with experienced trial counsel; and (5) he understood courtroom rules and procedures well enough to participate actively in his defense at trial by moving to suppress evidence, making objections, moving for a judgment of acquittal, and examining and cross-examining witnesses. Id. Furthermore, the Court pointed out that Jones missed his best opportunity to develop the record

32

when, at the motion for a new trial hearing, he failed to testify whether he knew from Saari or any other source the dangers of self-representation. Id. In light of the record evidence supporting the inference that Jones's waiver was knowing and "the dearth of evidence pointing to the opposite conclusion," the Court concluded Jones had not met his burden of proving his waiver of counsel was not knowing. Id. at *17-18.

With Garey and Jones as background, we now turn to Meriwether's case.

C.    Meriwether's Case

As noted earlier, on direct appeal, the Georgia Court of Appeals expressly rejected Meriwether's claim that he had not voluntarily and knowingly waived his right to counsel. Meriwether v. State, No. A01A2134, at 3 (Ga. Ct. App. Dec. 7, 2001) (unpublished). In affirming Meriwether's convictions, the Georgia Court of Appeals concluded that where a defendant lacks good reason for discharging appointed counsel, the trial court does not err in requiring a defendant to choose between representing himself or proceeding with appointed counsel. Id. The Georgia Court of Appeals also determined that Meriwether was attempting to use his discharge of appointed counsel Rasnick and employment of other counsel as a dilatory tactic and that the trial court did not err in requiring Meriwether to proceed to trial pro se (with Rasnick as standby counsel) because of Meriwether's voluntary

33

and knowing waiver of appointed counsel.  Id.

Our § 2254 review of the Georgia Court of Appeals' decision is "highly deferential" to the state court's decision.  Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1303 (11th Cir. 2005); Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002); Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002).  We may not grant federal habeas relief on Meriwether's right-to-counsel claim, which was clearly adjudicated on the merits in the state court, unless that state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding," 28 U.S.C. § 2254(d)(2).[6]

### 1.    Section 2254(d)(1)

The first issue is whether Meriwether has shown under § 2254(d)(1) that the Georgia Court of Appeals' decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  The phrase "clearly established federal law" in § 2254(d)(1) refers to the holdings of the Supreme Court at the time of the relevant

---

[6]Because Meriwether filed his petition after the effective date of AEDPA, this case is governed by § 2254, as modified by AEDPA.

34

state court decision, which was 2001 in Meriwether's case. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003).

Meriwether appears to argue the Georgia Court of Appeals' decision was an unreasonable application of the clearly established federal law in <u>Faretta</u> because he never affirmatively asked to proceed <u>pro se</u>. Meriwether has not satisfied the standard in § 2254(d)(1) as to that issue. First, as noted in our recent <u>en banc</u> decisions, there is no clearly established Supreme Court precedent addressing whether a waiver of counsel occurs when a defendant rejects his appointed counsel without good cause (much less as here, appointed counsel whom the state court noted was highly qualified and had prepared to proceed to trial). <u>See</u> <u>Garey</u>, __ F.3d __, 2008 WL 3850284, at *7 ("The Supreme Court has never confronted a case in which an uncooperative defendant has refused to accept appointed counsel or engage in a colloquy with the court."); <u>Jones</u>, __ F.3d __, 2008 WL 3853313, at *10 ("Jones cannot meet the requirement of § 2254(d)(1) because the Supreme Court has never confronted a Sixth Amendment challenge involving a defendant who rejects his appointed counsel without good cause.").[7]

_____

[7]Because clearly established federal law is not the law of the lower federal courts, including this Court, the <u>Garey</u> and <u>Jones</u> en banc decisions do not constitute clearly established federal law for purposes of § 2254(d). <u>See</u> <u>Shere v. Sec'y, Fla. Dep't of Corr.</u>, __ F.3d __, No. 07-13768, 2008 WL 3066738, at *6 (11th Cir. Aug. 7, 2008) (stating that "our review is limited to examining whether the highest state court's resolution of a petitioner's claim is contrary to, or an unreasonable application of, clearly established law, as set forth by the United States Supreme Court" and thus an Eleventh Circuit case "cannot form the basis of habeas relief under

35

Second, the en banc Garey Court already rejected the argument, which Meriwether now makes, that the right to counsel could be validly waived under federal law only in the Faretta context of an affirmative waiver by a defendant because "it forces judges to ignore words, actions, and circumstances relevant to the Sixth Amendment inquiry." Garey, __ F.3d __, 2008 WL 3850284, at *8. Thus, Garey recognized that a voluntary waiver of the right to counsel validly occurs beyond the context in Faretta when an uncooperative defendant rejects the only counsel to which he is constitutionally entitled. Id.

That is what happened here. Meriwether waited until the day of trial to complain to the trial court about his appointed counsel. The trial court told Meriwether he had a fine lawyer representing him and explained to Meriwether his two options: proceed either with Rasnick as counsel or pro se. Like Garey and Jones, Meriwether never affirmatively requested to represent himself, but he rejected his appointed counsel without cause and thereby voluntarily waived his right to counsel through his conduct, the same as if he had affirmatively requested to represent himself. See Garey, __ F.3d __, 2008 WL 3850284, at *12; Jones, __

AEDPA"); Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). However, Jones and Garey are precedent as to what Supreme Court law is regarding waiver of the Sixth Amendment right to counsel and thus aid our analysis of whether the state court's decision was "contrary to, or an unreasonable application of" Supreme Court precedent. See Phoenix v. Matesanz, 233 F.3d 77, 83 (1st Cir. 2000) ("Although decisions issuing from this Court are not 'clearly established' for the purposes of § 2254(d)(1) because they do not issue from the Supreme Court, they provide significant insight on what constitutes reasonableness for a particular fact pattern.").

F.3d __, 2008 WL 3853313, at *12.

Thus, for all these reasons, Meriwether has not shown under § 2254(d)(1) that the state courts' determination that he validly waived his right to counsel was contrary to, or an unreasonable application of, federal law.

2.      Section 2254(d)(2)

Even if Meriwether's rejection of his appointed counsel constituted a voluntary waiver of counsel, Meriwether also argues that the record contains no evidence that Meriwether knew of the dangers and disadvantages of self-representation and thus the Georgia Court of Appeals unreasonably determined that his waiver of counsel was knowing. Although Meriwether casts this as a § 2254(d)(1) claim, the substance of his claim is that there is no evidence in the record to support the Georgia Court of Appeals' determination that Meriwether's waiver was in fact knowing, which is more akin to a § 2254(d)(2) claim.[8]

_____

[8]The state court's decision in this case, brief as it may be, is an adjudication on the merits to which we must give deference. See, e.g., Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) (explaining that nothing in the text of § 2254(d)(2) "requires the state court adjudication that has resulted in a decision to be accompanied by an opinion that explains the state court's rationale"). Furthermore, the state court's "dispositive ruling may contain implicit findings, which, though unstated, are necessary to that ruling," Hightower v. Terry, 459 F.3d 1067, 1072 n.9 (11th Cir. 2006), and such findings are entitled to the same deference under § 2254(d) as explicit findings, see Hodges v. Att'y Gen., State of Fla., 506 F.3d 1337, 1347 n.2 (11th Cir. 2007), petition for cert. filed, __ U.S.L.W. __ (U.S. May 28, 2008) (No. 07-11218). Here, the state court determined Meriwether's waiver was voluntary and knowing. Implicit in that determination was a finding that Meriwether had sufficient knowledge and experience to make a knowing waiver. Thus, we address Meriwether's claim that he did not have sufficient knowledge or understanding to waive counsel validly.

Meriwether's argument fails for multiple reasons.

First, the absence of record evidence of <u>Faretta</u> warnings by the trial court is "not conclusive proof that a defendant's waiver of counsel was unknowingly made." <u>Jones</u>, __ F.3d __, 2008 WL 3853313, at *14. The <u>en banc</u> Court in <u>Jones</u> expressly rejected the argument that a defendant's right to counsel can be knowingly waived only if the trial court itself gives <u>Faretta</u> warnings on the record. Rather, as <u>Jones</u> explained, the "ultimate test of whether a defendant's choice is knowing is not the adequacy of the trial court's warning but the defendant's understanding." <u>Id.</u> (quotation marks omitted). The test for a knowing waiver is the defendant's understanding and his knowing the risks associated with self-representation, whether from "the trial court, a conversation with his counsel, or his own research or experience." <u>Id.</u>

Second, while the trial court here did not use the phrase "dangers and disadvantages of self-representation" <u>per se</u>, the trial court did at length encourage Meriwether to use Rasnick as his counsel and explained to Meriwether in detail all the parts of the trial and what Meriwether <u>pro se</u> would be required to do during the trial. Moreover, the trial court had Rasnick remain as standby counsel throughout the entire trial.

Third, the record shows that Meriwether was twenty-eight years old at the

38

time of trial and had a high school education. The record also indicated that Meriwether had a prior conviction for aggravated assault,[9] which shows Meriwether had previous involvement with the criminal justice system. Further, the fact that Meriwether threatened to file a complaint with the State Bar association about Rasnick and knew to contact the State Bar to ask whether he could discharge his appointed counsel demonstrates he had some knowledge of the legal system. In addition, Meriwether's competency in representing himself at trial provides strong evidence that he had some knowledge of the legal system and what self-representation required. At trial, Meriwether questioned his own witnesses and cross-examined the State's witnesses. He objected to the State's efforts to admit hearsay testimony from an unavailable witness. At the end of trial, he successfully moved for a directed verdict of acquittal on three counts in the indictment and later he moved for a mistrial and filed several post-judgment motions for relief. The trial court even commented after the first day of trial that Meriwether was "fairly smart" and was "handling [himself] pretty well in the courtroom." Thus, the state court record supports the state courts' knowing determination.

---

[9]At trial, the State told the court that Meriwether had a prior conviction for aggravated assault. This is the same offense referenced in Rasnick's September 13, 1999 letter to Meriwether, which advised him that the State was going to use a 1990 prior felony conviction for shooting another person against him.

Fourth, and most importantly, this is a § 2254 case, not a direct appeal, and Meriwether had the burden to show his waiver was not knowing, as found by the Georgia Court of Appeals. Yet, Meriwether testified extensively at the November 13, 2000 post-judgment motions hearing and failed to testify as to what he knew or did not know about the dangers and disadvantages of self-representation at the time he rejected Rasnick as appointed counsel and waived his right to counsel. Instead, he contends only that the record does not show the trial court adequately advised him of the dangers of proceeding without counsel.[10]

Thus, in light of the lack of testimony by Meriwether as to his knowledge at the time of waiver combined with the significant evidence supporting the state court's determination that Meriwether's waiver was knowing, we conclude that the

---

[10]Meriwether argued for the first time in his state and federal habeas proceedings that he was not aware of all charges or penalties he faced until trial when he received the State's discovery packet. However, Meriwether's right-to-counsel claim already was decided in the state direct appeal, and Meriwether did not argue in his brief on direct appeal in state court that his waiver of counsel was not knowing for these reasons. Thus, Meriwether did not exhaust that claim in state court. See 28 U.S.C. § 2254(b), (c). In fact, as already noted in the procedural history, the state habeas court itself held that Meriwether's right-to-counsel claim was litigated adversely to him on direct appeal and could not be relitigated in the state habeas proceedings.

In any event, the record contains some evidence that Meriwether was aware of the serious nature of the charges against him and that he faced a serious penalty, such as: (1) a document dated August 18, 1999–the date Meriwether was released on bond–that is signed by Meriwether and lists six of the eight charges against him (the kidnapping, battery, and four aggravated assault charges); (2) Rasnick's September 13, 1999 letter advising Meriwether to accept a plea bargain because there was "no way to win" his case and Meriwether probably would be convicted and receive a life sentence; and (3) Rasnick's September 17, 1999 letter advising Meriwether this was a "serious matter." See, e.g., Fitzpatrick v. Wainwright, 800 F.2d 1057, 1066 & n.6 (11th Cir. 1986).

Georgia Court of Appeals' decision was not based on an unreasonable determination of the facts in light of the evidence.[11]

## VI. Conclusion

For all of the reasons above, we affirm the district court's order denying Meriwether's § 2254 petition.

**AFFIRMED.**

---

[11]We recognize that Meriwether suggests his waiver of counsel was not knowingly made because of his use of crack cocaine. At the November 13, 2000 hearing on his post-judgment motions before the state trial court, Meriwether testified that he was "incompetent" on the day of trial and "was on drugs at the time [he] stood in the courtroom." Later in the hearing, he expounded on this description of his mental state at trial by saying, "I was incompetent. I was a person on drugs. Burnt out. Mind gone." However, Meriwether failed to argue in his § 2254 petition or in his brief to this Court that his waiver of counsel was not knowing because of his crack cocaine use. Thus, he abandoned that argument. Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989). Furthermore, Meriwether's actual performance in the trial and the trial court's assessment of Meriwether's performance at trial contradicts Meriwether's suggestions that he was incompetent at trial because of his crack cocaine use.