[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  12-13260

_____

D.C. Docket No. 6:06-cv-1768

ANTHONY JOSEPH FARINA,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
FLORIDA ATTORNEY GENERAL,

Respondents-Appellees,

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 30, 2013)

Before BARKETT, MARTIN, and JORDAN, Circuit Judges.

PER CURIAM:

Courts have long recognized that the Eighth Amendment carries within it a

"heightened 'need for reliability in the determination that death is the appropriate

punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion)). One important safeguard of that reliability is a capital sentencing jury that understands "the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.'" *Id.* at 341 (quoting *McGautha v. California*, 402 U.S. 183, 208 (1971)). In this appeal, we consider—through the lens of an ineffective assistance of appellate counsel claim—whether a prosecutor's injection of religious authority into a capital sentencing proceeding (conduct that the State has conceded is "as improper as can be") diminished the jury's sense of responsibility in a way that undermined the reliability of its death recommendation. Because we conclude that it did, we reverse the district court's denial of habeas corpus relief.

## I. Factual and Procedural History

Following a joint trial, Anthony Joseph Farina and his brother Jeffrey (to whom we refer as Jeffrey Farina to avoid confusion) were convicted by a Florida jury of one count of first-degree murder, three counts of attempted murder, and one count each of armed robbery, burglary, and conspiracy to commit murder. *See Farina v. State*, 679 So. 2d 1151, 1152 (Fla. 1996) (*Farina I*). The facts, as recited by the Florida Supreme Court, are these:

> After a Taco Bell restaurant closed early on May 9, 1992, Jeffrey and
> Anthony Farina confronted Michelle Van Ness, 17, and Derek Mason,

2

16, while the two employees were emptying trash. Jeffrey had a .32-caliber pistol, Anthony carried a knife and rope, and both wore gloves.

The Farinas ordered Van Ness and Mason into the restaurant, where they rounded up two other employees. Jeffrey held three employees at gunpoint while Anthony forced employee Kimberly Gordon, 18, to open the safe and hand over the day's receipts. The Farinas then tied the employees' hands, and Anthony forced them into a walk-in freezer. Jeffrey then shot Mason in the mouth. He also shot employee Gary Robinson, 19, in the chest and Van Ness in the head, and stabbed Gordon in the back. The Farinas fled the restaurant, but were arrested later that day. Van Ness died on May 10.

*Farina v. State*, 937 So. 2d 612, 616 (Fla. 2006) (*Farina III*) (footnotes omitted).

At sentencing, the jury recommended a sentence of death for Mr. Farina by a vote of seven to five, and the trial court followed that recommendation. *See id.* Jeffrey Farina also received a sentence of death after the jury recommended it by a wider margin—a vote of nine to three. *See Farina v. State*, 680 So. 2d 392, 394 (Fla. 1996) (*Jeffrey Farina I*).

## A. Direct Appeal & Resentencing

On direct appeal, the Florida Supreme Court vacated the death sentences of both Farina brothers because a qualified prospective juror had been erroneously excused for cause during their joint trial. *See Farina I*, 680 So. 2d at 1157-58; *Jeffrey Farina I*, 680 So. 2d at 398-99. The brothers then received a new joint penalty proceeding before a new jury. *See Farina III*, 937 So. 2d at 617.

The new jury unanimously recommended a sentence of death for both of the Farinas, and the trial court imposed that penalty after finding five statutory

3

aggravating factors, three statutory mitigating factors, and 15 non-statutory mitigating factors. *See id.*[1] Mr. Farina once again appealed his death sentence, arguing among other things that the prosecutor had improperly struck two prospective jurors based on race, but this time the Florida Supreme Court affirmed. *See Farina v. State*, 801 So. 2d 44, 48-49 (Fla. 2001) (*Farina II*).

## B. Subsequent Proceedings

The Florida Supreme Court set aside Jeffrey Farina's death sentence and reduced the sentence to life imprisonment without the possibility of parole for a period of 25 years. It concluded that imposing a sentence of death on Jeffrey Farina—who was 16 at the time of the crimes—constituted cruel and unusual punishment under the Florida Constitution. *See Farina v. State*, 763 So. 2d 302, 303 (Fla. 2000) (*Jeffrey Farina II*).

After resentencing, Mr. Farina filed his own motion for post-conviction relief under Fla. R. Crim. P. 3.851. When that motion was denied, he appealed to

---

[1] "The aggravating factors were: (1) prior violent felony based upon the attempted murders of the other restaurant employees; (2) the murder was committed to avoid arrest; (3) the murder was committed for pecuniary gain; (4) the murder was heinous, atrocious, or cruel (HAC); and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The statutory mitigators were: Anthony had no significant history of prior criminal activity; he was an accomplice in the capital felony committed by [Jeffrey Farina] and his participation was relatively minor; he was eighteen years old at the time of the crime. The nonstatutory mitigators were: abused and battered childhood, history of emotional problems, cooperation with the police, involvement in Christianity and Bible study courses while in prison, good conduct in prison, remorse for what happened, assertion of a positive influence on others, no history of violence, abandonment by his father, poor upbringing by his mother, lack of education, good employment history, and amenability to rehabilitation." *Farina III*, 937 So. 2d at 617 n.3 (internal quotation marks and citations omitted).

the Florida Supreme Court. At the same time, he also filed a state habeas corpus petition. The Florida Supreme Court, with three justices dissenting in part, rejected all of the claims asserted by Mr. Farina. *See Farina III*, 937 So. 2d at 617-35.

Mr. Farina then filed a petition for a writ of habeas corpus in federal district court. *See* 28 U.S.C. § 2254. In a detailed order, the district court denied habeas relief, *see Farina v. Secretary*, 2012 WL 1016723 (M.D. Fla. 2012) (*Farina IV*), but granted Mr. Farina a certificate of appealability on whether the Florida courts had erred in denying his claims of newly discovered evidence (that Jeffrey Farina had his death sentence reduced to life imprisonment and that Jeffrey Farina exercised dominion and control over Mr. Farina). *See* Claim 14, First Amended Petition, D.E. 49 at 71. We granted a certificate of appealability on two additional claims: whether the prosecution exercised two peremptory strikes on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny, *see* Claim 6, D.E. 49 at 38; and whether Mr. Farina's appellate counsel rendered ineffective assistance by failing to raise a prosecutorial misconduct claim based on the prosecutor's injection of religious authority at the resentencing proceeding, *see* Claim 17, D.E. 49 at 90.

We conclude that Mr. Farina is entitled to a new sentencing proceeding because his appellate counsel rendered ineffective assistance by failing to raise the prosecutorial misconduct claim. We therefore do not address the other claims. *See*,

5

*e.g.*, *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1357 n.21 (11th Cir. 2011); *Johnson v. Sec'y, DOC*, 643 F.3d 907, 938 n.11 (11th Cir. 2011).

## II. Standard of Review

We review *de novo* the denial of a petition for a writ of habeas corpus. *See*, *e.g.*, *Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1330 (11th Cir. 2013). The Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996 precludes federal courts from granting habeas relief on a claim already adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision violates § 2254(d)(1) if it applies a rule that contradicts the governing law set forth by the United States Supreme Court or arrives at a result that differs from Supreme Court precedent when faced with materially indistinguishable facts. *See*, *e.g.*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).

"Federal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence." *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc). "When a state court's adjudication of a habeas claim results in a decision that is

6

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Id.* (quotations marks, citations, and alterations omitted). In other words, "[w]hen a state court unreasonably determines the facts relevant to a claim, 'we do not owe the state court's findings deference under AEDPA,' and we 'apply the pre-AEDPA *de novo* standard of review' to the habeas claim." *Cooper*, 646 F.3d at 1353 (quoting *Jones*, 540 F.3d at 1288).

As we explain, the Florida Supreme Court made several unreasonable factual determinations in rejecting Mr. Farina's ineffective assistance of appellate counsel claim in *Farina III*, and we therefore do not give its decision on this claim the typical AEDPA deference. To demonstrate why these factual determinations were unreasonable, we recite the relevant portions of the resentencing proceeding, summarize the arguments made by Mr. Farina in his Rule 3.851 motion and state habeas corpus petition, and analyze the findings made by the Florida Supreme Court in denying relief.

## A.    The Prosecutor's Use of Religion at Resentencing

At several critical points during the resentencing proceeding, the prosecutor repeatedly and improperly used religion to support his request for a sentence of death.

7

1. During jury selection, the prosecutor had the following discussion with a prospective juror:

> [Prosecutor]: You don't believe that the State's authority to take a life in appropriate circumstances conflicts with your understanding of your Christian beliefs?
>
> Juror: No. In fact, Jesus said give to Caesar what's Caesar's, and obey the law according to how you're supposed to.

*Farina III*, 937 So. 2d at 640-41 (Anstead, J., concurring in part and dissenting in part). Following up on that exchange, the prosecutor later delivered this instruction to the entire venire:

> [J]urors are obligated and expected, if they serve on a jury, to follow [the Judge's instruction on the law], even if they don't agree with the instructions. But you're not required, or expected, to abandon deeply held religious, moral, and conscientious, or other beliefs. *In other words, if the conflict is so great that you say, I would like to follow the Judge's instructions, I want to be respectful, but on this issue I couldn't follow that instruction. I couldn't do this. That's perfectly legitimate. There's nothing wrong with it. That doesn't mean you're doing anything improper or disrespecting the Court.*

*Id.* at 640 (emphasis added). And, returning to this Christian theme for the third time during voir dire, the prosecutor mentioned the theory of salvation—which he called "fire insurance" because a "saved" person will reach "Heaven" no matter how he dies. *See id.* at 641.

2. After the jury was empanelled, the religious theme reemerged during the presentation of Mr. Farina's mitigation case. One defense witness, Rev. James Davis—a prison pastor who had counseled Mr. Farina—testified on direct

8

examination that, since his incarceration, Mr. Farina had sincerely accepted religion, studied the Bible, joined a church, and expressed a desire to minister to other inmates. *See* Ex. F-24 at 1822-28. Although the defense used Rev. Davis to address topics of reform and rehabilitation in the context of Mr. Farina's religious conversion, the prosecutor did not ask Rev. Davis questions about the sincerity of Mr. Farina's religious beliefs. Instead, his cross examination and re-cross examination suggested that, as a matter of Christian faith, it was perfectly fine for the jury to sentence Mr. Farina to death:

> [Prosecutor]: You formed some pretty strong opinions about these young men. And I believe there's sincerely hell. I want to ask you, did you rely just upon your observations and experience, or did you put any thought or evaluation into how they stacked up according to the Bible?
>
> Davis: By the Bible's word, that and my emotion, because they were repentant to me for the crime that they had committed. And I saw signs of that in their actions and in their verbalization, and in their emotions and in their feelings. And to me that's the way I can look at something and tell whether it's what it says it is, if it appears to be that, you know.
>
> [Prosecutor]: But as a man of God, you certainly don't make real serious judgments or considerations without holding up your opinion to maybe God's standard and his word? Is that part of . . . .
>
> Davis: I'm definitely not God.
>
> [Prosecutor]: What I'm asking you is you put heavy reliance upon the Bible, don't you?
>
> Davis: Yes, I do.

[Prosecutor]: What is the Bible to you?

Davis: It's the infallible word of God, inspired word of God that God gave to us as our . . . .

[Prosecutor]: But from my understanding of the Bible, is men actually wrote the words down and you say it's the word of God?

Davis: Inspired by the Holy Spirit, right.

[Prosecutor]: Are you familiar with the Book of Romans? Do you know who wrote it?

Davis: Paul, Apostle Paul.

[Prosecutor]: What happened to Paul ultimately?

Davis: Paul was killed ultimately.

[Prosecutor]: By the Roman government?

Davis: Uh-huh.

[Prosecutor]: And even though Paul was a prisoner of the Roman government, he wrote a very significant book called the Romans; did he not?

Davis: Yes, he did.

[Prosecutor]: Are you familiar with the first of seven verses of Romans thirteen?

Davis: Yes. About honoring authority, submitting to authority. The judge and the prosecutor and the defense attorneys all work for God and are ordained by God as being the authority and in the positions that they are and if they . . . God is the one that allows them to be there.

[Prosecutor]: Well, I don't want to say that defense attorneys aren't saved. But they're not the authorities, are they, they are defense

10

lawyers versus the prosecutor?

Davis: Right.

[Prosecutor]: Your honor, may I hand him something to help with his memory as well?

[Defense]: Your honor, I don't know what he's tendered to the witness.

[Prosecutor]: Romans.

Davis: It's a copy of the Bible, scripture out of the Bible.

[Prosecutor]: What does Romans one and two say about authority under God's law?

Defense: Perhaps he can show the relevancy of this. I don't know why we are referring to this at this time . . . .

Relevance objection.

[Prosecutor]: Your honor, I will link it up when I lay the foundation. I believe you will see the relevancy as we . . . .

Court: To this witness' testimony, not just a philosophical or religious discussion?

[Prosecutor]: No, sir.

Court: This is specific testimony?

[Prosecutor]: Yes. It will relate directly to this witness' testimony.

Court: Connect it up. And, [defense counsel], if it's not properly connected up, go ahead and renew your objection.

Davis: Read verse one and two?

[Prosecutor]: Yes, sir.

11

Davis: Everyone must submit himself to the governor of authorities for there is no authority except for which God has established. The authorities that exist have been established by God. Consequently, he who rebels against the authority is rebelling against what God has instituted. And those who do so will bring judgment on themselves.

[Prosecutor]: The next verse deals with the prosecutor; does it not? What does it say?

Davis: For the rulers hold no terror for those who do right, but for those who do wrong. Do you want to be free from fear that the one in authority and do what is right and you will-jumps over here-he will command you.

[Prosecutor]: And the next verse?

Davis: Where he is God's servant to do your good, but if you do wrong, be afraid for he does not bear the sword for nothing. He is God's servant and agent to wrath, to bring punishment to the wrongdoer.

[Prosecutor]: And the next?

Davis: Therefore, it is necessary to submit to the authorities not only because of the possible punishment, but also because of your conscience.

[Prosecutor]: Is there anything in scripture that you find that says the laws and the government should excuse crimes because someone is repentant?

Davis: Specifically the law and government, no.

[Prosecutor]: Tells us Christians forgive one another?

Davis: Yes.

[Prosecutor]: But that's not inconsistent with the government's responsibility to uphold the law and bring the punishment which-and

the word of the Lord, that you have just read, that bring judgment on themselves; is that correct?

Davis: That's correct.

[Prosecutor]: . . . [W]hen Christ was on the cross there was a condemned felon beside him that repented and accepted Christ, is that right?

Davis: That's right.

[Prosecutor]: But he didn't take that felon off the cross or forgive the death penalty, did he?

Davis: No.

[Prosecutor]: He said he would see him in paradise.

Davis: Yeah.

.  .  .  .

[Prosecutor]: Christ died for sinners?

Davis: Yes.

[Prosecutor]: And Paul died because of Christ?

Davis: Yes.

[Prosecutor]: Is there anything inconsistent with that. That these men face the death penalty for the murder of a seventeen-year-old girl?

Davis: No.

*Farina III*, 937 So. 2d at 641-43 (Anstead, J., concurring in part and dissenting in part).

3. In his closing argument, the prosecutor returned to one of the passages

13

from Romans 13:2 that he had asked Rev. Davis to read ("And those who do so [i.e., rebel against authority] will bring judgment on themselves.") to the jury. Tying up his initial instructions to the jury and his cross-examination of Rev. Davis, the prosecutor finished his summation by telling the jury that the Farinas had "brought this judgment upon themselves." Ex. F-28 at 2366.

Save for the one relevance objection noted above, Mr. Farina's trial counsel did not lodge any objections to the prosecutor's religious instructions, comments, questions, or arguments. On direct appeal from the resentencing proceeding, Mr. Farina's appellate counsel did not raise any argument concerning the prosecutor's use of religion during the resentencing proceeding.

**B. Mr. Farina's Rule 3.851 Motion & State Habeas Corpus Petition**

As part of his Rule 3.851 appeal, Mr. Farina argued that his trial counsel was ineffective for failing to object to "comments and instructions which diminished the jury's sense of responsibility under *Caldwell v. Mississippi*, 472 U.S. 320 (1985)." Ex. M at 19-20. Among the claims raised in his state habeas appeal, Mr. Farina similarly asserted that his appellate counsel had rendered ineffective assistance by failing to raise a claim of prosecutorial misconduct based upon the prosecutor introducing biblical arguments and authorities during jury selection, the defense's mitigation case, and closing argument. He also argued that cumulative errors deprived him of a fair trial.

14

The Florida Supreme Court ruled that Mr. Farina's *Caldwell* claim was procedurally barred. That claim, it concluded, should have been raised on direct appeal. *See Farina III*, 937 So. 2d at 617 n.4.

Turning to Mr. Farina's state habeas petition, the Florida Supreme Court began by listing which of the claims it would not decide on the merits because they were either procedurally barred, legally insufficient, conclusory, or clearly meritless. *See id.* at 625. Among these were the portion of Mr. Farina's ineffective assistance claim dealing with jury selection—because the Florida Supreme Court found that Mr. Farina had "fail[ed] to allege specific objectionable errors" as to that portion—and the cumulative error claim, both of which it found to be procedurally barred. *See id.* The Florida Supreme Court addressed the merits of only one of Mr. Farina's state habeas claims: that his appellate counsel was ineffective for failing to raise a claim of prosecutorial misconduct based on the use of religious authority during the cross-examination of Rev. Davis and during closing argument. *See id.* at 626.

As to the portion of Mr. Farina's ineffective assistance claim dealing with cross-examination, the Florida Supreme Court first found that the prosecutorial misconduct claim upon which it was based had not been properly preserved for appeal. *See id.* at 629. It then explained that Mr. Farina's trial counsel had not objected to the problematic testimony with the required specificity because he had

15

raised only a relevance objection and that, even as to his relevance objection, he had failed to obtain a final ruling from the trial court. *See id.* Because appellate counsel cannot be ineffective under Florida law for failing to raise an unpreserved error, it concluded that Mr. Farina could not prevail on his claim of ineffective assistance of appellate counsel unless he could demonstrate that the prosecutor's conduct amounted to "fundamental error." *See id.*

Citing to Florida case law, the Florida Supreme Court noted that the fundamental error doctrine should be used "very guardedly" and that "prosecutorial misconduct constitutes fundamental error when, but for the misconduct, the jury could not have reached the verdict it did." *See id.* (quotation marks omitted). Under these principles, it concluded that the prosecutor's conduct was not fundamental error for three reasons: Mr. Farina "first introduced religion into the proceedings" when he called his prison minister, Rev. Davis, to testify; the conduct was "less egregious because it occurred during cross-examination"— where prosecutors have greater latitude—instead of "during argument to the jury;" and the conduct was minimal "in light of the entire record," which included 35 other witnesses, five days of proceedings, and a jury finding of five aggravating circumstances not discussed by Rev. Davis. *See id.* at 631-32. Despite agreeing that the prosecutor's cross-examination was "improper," the Florida Supreme Court held that it did not "impact the foundation of the case." *See id.* at 632

16

(quotation marks omitted).

As to the portion of Mr. Farina's ineffective assistance claim dealing with closing argument, the Florida Supreme Court noted that it was "unclear whether the prosecutor made any biblical references at all, given that he used common terms." *See id.* at 634. Still, it concluded that the closing "alluded to the Book of Romans." *See id.* at 635. Even with that allusion, however, it determined that the prosecutor's argument "lack[ed] the force of other more obvious references" the court had previously held were not fundamental error. *See id.* Finding that the prosecutor's conduct during closing argument also did not rise to the level of fundamental error, the Florida Supreme Court denied both Mr. Farina's ineffective assistance of counsel claim and his petition for habeas corpus relief. *See id.*

Two justices dissented in part with a written opinion, specifically disagreeing with the majority's resolution of Mr. Farina's prosecutorial misconduct claim. *See id.* (Anstead, J., joined by Pariente, J., concurring in part and dissenting in part).[2] As to Mr. Farina's prosecutorial misconduct claim, the dissent called the prosecutor's references to biblical law "extensive and egregious" and noted that the conduct violated Florida's "rule prohibiting the invocation of religious doctrine in death penalty cases." *See id.* at 638. After examining law from other jurisdictions, including this circuit, that had "been quick to condemn similar" conduct, the

---

[2] Justice Quince also concurred in part and dissented in part, but she apparently did not join Justice Anstead's separate opinion. Nor did she write a separate opinion expressing her views.

dissent catalogued how the prosecutor had implemented a "deliberate strategy seeking the imposition of the death penalty based on biblical law." *See id.* at 639-40. Calling the strategy "improper," the dissent characterized the prosecutor's message to the jury this way: "based on religious dogma, it was not the jury that was condemning the defendant to death, it was the defendant himself, since the biblical scripture explicitly said so." *See id.* at 643. "This blatant and emotional appeal to religious authority to guide the jury's decision," concluded the dissent, "clearly infected the fundamental fairness of the proceeding. . . ." *See id.*

### C.    Mr. Farina's Federal Habeas Corpus Petition

In making his ineffective assistance of appellate counsel/prosecutorial misconduct claim in the district court, Mr. Farina once again asserted that counsel was ineffective for failing to argue that the prosecutor had acted improperly on several occasions: at voir dire, during cross-examination of a mitigation witness, during victim impact statements, and at closing argument. *See Farina IV*, 2012 WL 1016723, at *43. The district court reiterated the Florida Supreme Court's finding that Mr. Farina "did not cite to any portions of the record or instances of improper argument in his state habeas petition in order to support" the portion of this claim dealing with voir dire. *See id.* at *44. Because "the state court's determination was essentially that the petition was facially insufficient"—an adequate and independent state ground—the district court concluded that it could not consider

18

the jury selection issue unless Mr. Farina demonstrated cause and prejudice. *See id.* Finding that Mr. Farina had not met that standard, the district court deemed the issue procedurally defaulted. *See id.*

Addressing the prosecutor's conduct during the cross-examination of Rev. Davis, the district court first set out the two-part test for evaluating prosecutorial statements under federal law: whether the statements were improper and whether they were "so prejudicial as to render the entire trial fundamentally unfair." *See id.* at *45. The court then recognized that, under our precedent, a trial is fundamentally unfair if "there is a reasonable probability that, but for the prosecutor's offending remarks, the outcome would have been different" and that a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* (alterations omitted) (quoting *Williams v. Kemp*, 846 F.2d 1276, 1283 (11th Cir. 1988)). After recounting the prosecutor's cross-examination of Rev. Davis, the district court agreed with the Florida Supreme Court that Mr. Farina's counsel had not properly preserved this portion of his prosecutorial misconduct argument because he failed to object with enough specificity and did not elicit a ruling on his relevance objection. *See id.* at *45-*47.

Like the Florida Supreme Court, the district court analyzed Mr. Farina's claim using the "fundamental error" doctrine. *See id.* at *47. But unlike the Florida Supreme Court, the district court conducted its analysis using federal cases rather

19

than state cases. *See id.* at \*48-\*49. Comparing two of our decisions—*Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001), and *Shere v. Sec'y, Fla. Dep't of Corr.*, 537 F.3d 1304 (11th Cir. 2008)—the district court concluded that Mr. Farina's facts aligned better with those in *Shere*. *See Farina IV*, 2012 WL 1016723, at \*49. In reaching that conclusion, it found that the "prosecutor did not mention or argue religion in his closing argument," that Mr. Farina "essentially injected religion into the proceedings by calling" Rev. Davis "to establish a mitigation defense based in part on his sincerely held religious beliefs," and that there was "no indication that the cross-examination exceeded the scope of the religious matter explored on direct. . . ." *See id.* at \*48. Thus, while *Romine* involved conduct that "permeate[d] virtually every aspect of the resentencing trial," the district court determined that Mr. Farina's resentencing did not. *See id.* at \*49. There was therefore no fundamental error and no deficient performance by the appellate counsel for failing to raise the prosecutorial misconduct claim on appeal. *See id.* The district court denied Mr. Farina's ineffective assistance of counsel claim, *see id.*, and his petition for habeas relief as a whole.

### III. Analysis

As he did in his state post-conviction filings and in his federal habeas petition, Mr. Farina argues that "the prosecutor's use of words of command from the Christian Bible in support" of a sentence of death deprived him of "a

20

fundamentally fair sentencing proceeding." He contends that the prosecutor's conduct was so obviously improper that it "leaped out upon even a casual reading of the transcript" and that his appellate counsel's failure to raise the claim fell below prevailing professional norms. He also asserts that the Florida Supreme Court, in denying this claim, unreasonably applied clearly established federal law and made unreasonable determinations of the facts. After a thorough review of the record, we conclude that there is clear and convincing evidence that the Florida Supreme Court's rejection of Mr. Farina's ineffective assistance of appellate counsel claim was based on an unreasonable determination of the facts under § 2254(d)(2). *See* 28 U.S.C. § 2254(e)(1); *Ward v. Hall,* 592 F.3d 1144, 1155-56 (11th Cir. 2010).

### A.    The Florida Supreme Court's Unreasonable Determination of Facts

The first unreasonable determination of the facts occurred in the opening paragraph of the Florida Supreme Court's analysis of Mr. Farina's state habeas petition. Although the Florida Supreme Court found that Mr. Farina had "fail[ed] to allege specific objectionable errors" regarding the jury selection portion of his claim, *see Farina III*, 937 So. 2d at 625 n.8, the petition itself shows that Mr. Farina did in fact provide the required information. On page 17 of his petition, for example, Mr. Farina recounted the following instruction given by the prosecutor to potential jurors during voir dire:

[T]he State's comments in jury selection highlight the intentional and pervasive nature of the misconduct and are relevant to this Court's analysis of Farina's claim.

By way of example, the State told prospective jurors that:

> [J]urors are obligated and expected, if they serve on a jury, to follow [the judge's instruction on the law], even if they don't agree with the instructions. But you're not required, or expected, to abandon deeply held religious, moral, and conscientious, or other beliefs. In other words, if the conflict is so great that you say, I would like to follow the Judge's instructions, I want to be respectful, but on this issue I couldn't follow that instruction. I couldn't do this. That's perfectly legitimate. There's nothing wrong with it. That doesn't mean you're doing anything improper or disrespecting the Court.

This comment essentially told the jurors that it is "perfectly legitimate," *as a seated juror*, to use religious beliefs as a basis to reject the law.

Farina State Habeas Petition, Ex. P, at n.5 (internal quotation marks omitted).

Later in the same discussion, Mr. Farina cited three other examples of the State's objectionable behavior at voir dire:

> The State also told the jurors that a juror is required to follow the law but as the trial judge explained, a juror doesn't have to "abandon deeply held religious, moral, conscientious beliefs.

> The State *sua sponte* discussed the Christian concept of salvation, calling it 'fire insurance,' because no matter how someone dies they still go to Heaven if they're 'saved.'

> The State also had the following exchange with a juror:
> State: You don't believe that the State's authority to take a life in appropriate circumstances conflicts with your understanding of your Christian beliefs?
> Juror: No. In fact, Jesus said give to Caesar what's Caesar's, and obey

22

the law according to how you're supposed to.

*Id*. In short, Mr. Farina was very specific about the prosecutor's conduct.

The second unreasonable determination of the facts was the Florida Supreme Court's finding that, except for Rev. Davis' testimony, "there was no other evidence about religion" during the proceedings, *Farina III*, 937 So. 2d at 633, and the third was the finding that Rev. Davis' "testimony on direct examination [and not the prosecutor's cross-examination] first introduced religion into the proceedings." *Id*. at 631. Both determinations are unreasonable in light of the record, for an examination of the "entire context of the [resentencing] proceeding" reveals that it was peppered "with evidence relating to religion." *Romine,* 253 F.3d at 1369. Although Rev. Davis' testimony discussed the potential mitigating impact of Mr. Farina's religious conversion, it was clearly not the first or only time religion had been interjected into the proceedings.

As we have recounted, the prosecutor introduced religion into the proceedings during jury selection and actively sprinkled religious allusions throughout. As early as voir dire, the prosecutor advised the prospective jurors that they were "not required to abandon deeply held religious, moral, and conscientious, or other beliefs" even if such beliefs "conflict [with] . . . the Judge's instructions." Ex. F-19 at 882. *See also* Ex. F-17 at 703 (a juror need not "abandon deeply held religious . . . beliefs"). Additionally, the prosecutor sowed the seeds

23

for his later cross-examination of Rev. Davis when he asked a potential juror whether he believed "that the State's authority to take a life in appropriate circumstances conflicts with your understanding of your Christian beliefs?" Ex. F-15 at 141.

The prosecutor also discussed with a potential juror the concept of salvation in Christianity, calling it "fire insurance," and commenting that a saved person "goes to be with the Lord in Heaven regardless of how they die." Ex. F-19 at 974-75. The prosecutor recognized the religious nature of his own questions when he acknowledged to this potential juror that "this is a pretty tense issue just what we're here about, let alone the religious aspect." *Id*. at 976. *See also* Ex. F-18 at 776 (asking if a potential juror understood "[t]he Christian concept of someone being saved, that means that that person is accepting Christ as their savior"); *id*. at 777 (distinguishing between "Man's law versus God's law" in discussion with potential juror).

Moreover, prior to Rev. Davis' cross-examination, the prosecutor drew numerous religious-based comments from several witnesses during the State's victim impact testimony. *See* Testimony of Hannah Glidden, Ex. F-23 at 1573-74 ("She was like a spiritual helper for me. She loved God. And she made it easy to stand firm for what we believed."); Testimony of Deborah Wingard, Ex. F-23 at 1587 ("[S]he was a Christian young lady. And when you are a Christian, you have

a special love for people."). The State's witnesses mentioned the victim's Christian faith several times, *see* Ex. F-23 at 1582, 1587, and 1621; and three witnesses testified that the victim was in heaven, *see id*. at 1585, 1607, and 1610. We do not suggest that this testimony was improper, but we do conclude that it contradicts the Florida Supreme Court's finding that there was no other evidence about religion.

Finally, the fourth unreasonable determination of the facts is that "[t]he prosecutor's questions were related to [Rev.] Davis'[] testimony on direct examination," *Farina III*, 937 So. 2d at 632. Although the defense called Rev. Davis to testify about Mr. Farina's religious conversion and repentance, the prosecutor's cross-examination did not examine the sincerity of Mr. Farina's religious beliefs or repentance. Indeed, the majority of the prosecutor's questions to Rev. Davis on cross-examination and re-cross examination did not concern Mr. Farina personally, but rather, focused on improper, theological matters such as the prosecutor's role as a vehicle of divine retribution and the propriety of the death penalty. *See* Ex. F-24 at 1835-42.

### B.    Mr. Farina's Ineffective Assistance of Appellate Counsel Claim

Where, as here, there is clear and convincing evidence that, in light of the existing record, the state court unreasonably determined the facts relevant to a given claim, AEDPA deference does not apply, and we exercise plenary review over the claim. *See Cooper*, 646 F.3d at 1353 ("When a state court unreasonably

25

determines the facts relevant to a claim, we do not owe the state court's findings

deference under AEDPA, and we apply the pre-AEDPA de novo standard of

review to the habeas claim.") (internal quotation marks and citations omitted).[3]

With that standard in mind, we turn to the merits of Mr. Farina's claim that his

appellate counsel rendered ineffective assistance by not raising the prosecutor's

use of, and reference to, religion on appeal from the resentencing proceeding.

A claim of ineffective assistance of appellate counsel is evaluated under the

same standard as for trial counsel. *See Heath v. Jones*, 941 F.2d 1126, 1130 (11th

Cir. 1991). The Supreme Court, in *Strickland*, set out a two-part inquiry for such

ineffective assistance claims:

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so serious
> that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant must show
> that the deficient performance prejudiced the defense. This requires

---

[3] Although we need not decide the issue, there is also an argument that the Florida Supreme Court's decision should not receive AEDPA deference because "we have grave doubt that the [Florida Supreme Court] applied federal law at all." *Romine*, 253 F.3d at 1365. In addressing Mr. Farina's claim of ineffective assistance of *trial counsel*, the Florida Supreme Court began its review with *Strickland v. Washington*, 466 U.S. 668 (1984). Once it turned to Mr. Farina's claim of ineffective assistance of *appellate counsel*, however, "state court decisions are all the authority that [was] given." *Romine*, 253 F.3d at 1365. Having cited *Strickland* in a different section of the opinion, addressing a different claim, four pages prior, and with twelve intervening state court citations, the Florida Supreme Court may not have been applying federal law with regard to Mr. Farina's ineffective assistance of appellate counsel claim. "Failure to apply that governing law (or the same rule in state law) is tantamount to applying a rule that contradicts governing law," and "when there is grave doubt about whether the state court applied the correct rule of governing federal law, § 2254(d)(1) does not apply." *Id.*

showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. A habeas petitioner claiming ineffective assistance of counsel must succeed on both prejudice and performance prongs of the *Strickland* test. *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001). Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. *Strickland*, 466 U.S. at 688. Appellate counsel's performance will be deemed prejudicial only if we find that "the neglected claim would have a reasonable probability of success on appeal." *Heath*, 941 F.2d at 1132. We address the prejudice prong first, and then turn to the performance prong.

In evaluating the prejudice prong in an appellate ineffective assistance of counsel claim, we have recently explained that "the relevant proceeding is [the appellant's] direct appeal . . . [and] [i]t is therefore important to reconstruct the precise circumstances his appellate counsel confronted." *Dell v. United States*, 710 F.3d 1267, 1274 (11th Cir. 2013). Mr. Farina's underlying claim of prosecutorial misconduct was not preserved for appeal because trial counsel did not properly object at trial to the prosecutor's Biblical and religious instructions, questions, and references. Nevertheless, had Mr. Farina's appellate counsel raised the argument that the prosecutor's conduct was fundamental error, the direct-appeal panel would necessarily have applied fundamental error review. *See Hendrix v. State*, 908 So.

27

2d 412, 426 (Fla. 2005) ("Appellate counsel may not be deemed ineffective for failing to challenge an unpreserved issue on direct appeal unless it resulted in fundamental error."). To determine whether there was prejudice, therefore, we must evaluate whether there was a reasonable probability that Mr. Farina's argument—that the prosecutor's misconduct constituted fundamental error—would have won the day in 2001 on direct appeal. *See Dell*, 710 F.3d at 1274.

"In effect, *Strickland* requires us to put ourselves in the position of that direct-appeal panel and consider the following issue:" whether the prosecutor's conduct represented fundamental error. *Id.* In evaluating that issue, we consider the record evidence Mr. Farina's appellate counsel could reasonably have presented on direct appeal in 2001. *See id. Strickland* requires us to do so by "evaluat[ing] [appellate] counsel's conduct 'at the time' of the relevant proceeding and to avoid 'second-guess[ing]' or 'the distorting effects of hindsight.'" *Id.* (quoting *Strickland*, 466 U.S. at 696). "This directive also limits our inquiry into *Strickland*'s prejudice prong, where we must discern whether 'the decision reached would reasonably likely have been different absent [counsel's] errors.'" *Id.* (quoting *Strickland*, 466 U.S. at 696). As we have previously explained, "when [Mr. Farina] asserts he was prejudiced, what he means is that a competent appellate attorney would likely have won him resentencing on direct appeal by raising [the argument that the prosecutor's misconduct was fundamental error]." *Id.* Under

28

well-settled law, "habeas relief is due to be granted for improper prosecutorial argument at sentencing only where there has been a violation of due process, and that occurs, if but only if, the improper argument rendered the sentencing stage trial fundamentally unfair." *Romine*, 253 F.3d at 1366.

"A sentence proceeding is rendered unfair by an improper argument if, absent the argument, there is a reasonable probability that the result would not have been a death sentence, a reasonable probability being one which undermines our confidence in the outcome." *Romine*, 253 F.3d at 1368. *See also Spivey*, 207 F.3d at 1275-76; *Brooks v. Kemp*, 762 F.2d 1383, 1401 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (1987) (en banc); *Tucker*, 762 F.2d at 1504-05; *Drake*, 762 F.2d at 1458. "In making this prejudice determination, 'of primary importance is the need to examine the entire context of the judicial proceeding.'" *Romine*, 253 F.3d at 1369 (alterations omitted) (citing *Brooks*, 762 F.2d at 1400). *Accord Cargill v. Turpin*, 120 F.3d 1366, 1382 (11th Cir. 1997) ("after a thorough review of the full context of the sentence proceeding"); *Gates v. Zant*, 863 F.2d 1492, 1503 (11th Cir.1989) ("Considering the totality of the circumstances. . . .").

### 1.    Prejudice under *Strickland*, in light of *Dell*

We conclude that our holding in *Romine* is extremely germane here.  In *Romine*, where we also undertook plenary review of a petitioner's claim, we held

that a prosecutor's extensive reliance on biblical authority, which "permeated virtually every aspect of the resentencing trial," was improper and rendered the sentencing phase of the trial fundamentally unfair. *See Romine*, 253 F.3d at 1358-68. The prosecutor in *Romine* sought to convey to the jury that "the concept of mercy—the most significant factor which might point toward a choice of life imprisonment—[was] illegitimate." *Romine*, 253 F.3d at 1367 (citing to *Wilson v. Kemp*, 777 F.2d 621 (11th Cir. 1985)). We explained that "a prosecutor misleads a capital sentencing jury when he quotes scripture as higher authority for the proposition that death should be mandatory." *Id*. at 1368.

The conduct we found unconstitutionally improper in *Romine* is strikingly similar to the conduct of the prosecutor here, who preached the superiority of the prosecutor as a Godly-ordained authority and asked a defense mitigation witness, Rev. Davis, on cross-examination, to read verbatim from Bible verses which proclaimed the superiority of and necessity for divine judgment:

> Everyone must submit himself to the governor of authorities for there is no authority except for which God has established. The authorities that exist have been established by God. Consequently, he who rebels against the authority is rebelling against what God has instituted. And those who do so will bring judgment on themselves.

Ex. F-24 at 1840. The prosecutor purposely developed and fostered this ascendant-doctrine strategy throughout critical stages of the proceedings to diminish the

jurors' sense of responsibility and "eschew any consideration of mercy." *Romine*,

253 F.3d at 1359.

An examination of the prosecutor's behavior in the context of Mr. Farina's

entire judicial proceeding makes clear that his conduct was improper.[4]  During voir

dire, the prosecutor repeatedly instructed potential jurors not to "abandon deeply

held religious . . . beliefs" even at the expense of contradicting instructions from

the judge.  Ex. F-19 at 882. The prosecutor questioned potential jurors regarding

salvation while making an explicit differentiation between "Man's law versus

God's law." Ex. F-18 at 776. The prosecutor's cross-examination of Rev. Davis

drew heavily from Biblical verse, urging the implementation of God's law and

"submit[ting] to the authorities [established by God]." Ex. F-24 at 1840. While

elevating his own station as divinely-ordained authority, the prosecutor made clear

that the death penalty was the sole acceptable punishment under divine law, noting

how Christ himself refused to grant a felon forgiveness from the death penalty.

*See* Ex. F-24 at 1842. And one of the verses Rev. Davis was made to recite from

the Bible, that "those who [rebel against God] will bring judgment on themselves,"

was then incorporated in the last sentence of the prosecutor's closing argument.

Ex. F-28 at 2366 ("They have brought this judgment upon themselves. . . .").

---

[4] We again note that the Florida Supreme Court acknowledged the impropriety of the prosecutor's behavior, *see Farina III*, 937 So. 2d at 632 (describing the "prosecutor's cross-examination [as] improper"), and at oral argument, the State conceded the same, describing the prosecutor's cross-examination as "improper as can be."

31

These religious exhortations, occurring throughout Mr. Farina's sentencing proceeding, improperly "saturated [jurors] with evidence relating to religion," *Romine*, 253 F.3d at 1369, and constituted fundamental error.

We also conclude that Mr. Farina's circumstances are sufficiently distinguishable from those we reviewed in *Shere*, 537 F.3d at 1304. In *Shere*, the petitioner raised a claim similar to Mr. Farina's, that his appellate counsel's failure to challenge a prosecutor's Biblical references, including during cross-examinations of a defense witness and the petitioner himself, rendered his appellate counsel's assistance ineffective. *Id*. The Florida Supreme Court had suggested appellate counsel was not deficient for two reasons: first, the failure of trial counsel to properly object rendered many of the prosecutor's references unpreserved for appeal, and second, "it was the defense that injected religion into the proceedings in the first place, so the prosecutor's exploring religion on cross-examination was not reversible error, and thus, no meritorious ground for appeal existed." *Id*.  Our analysis in *Shere*, however, was necessarily limited by the deference owed to the Florida Supreme Court's decision; we specifically found that Mr. Shere failed to overcome AEDPA deference. *Id.* at 1310 ("under AEDPA, our review is limited to examining whether the highest state court's resolution of a petitioner's claim is contrary to, or an unreasonable application of, clearly

32

established law, as set forth by the United States Supreme Court"). Here, for reasons we have outlined, there is no such deference.

We noted in *Shere* that probing questions about religion may be acceptable on cross-examination of a witness testifying about a capital defendant's religion "so long as the cross-examination does not exceed the scope of the religious subject matter explored on direct." *Id*. at 1311. Because the *Shere* "prosecutor's Biblical references were valid cross-examination," i.e., within the scope of religion discussed on direct, we specifically found Mr. Shere's reliance on *Romine* unavailing. *Id*. at 1312. The prosecutor's cross-examination of Rev. Davis in this case, however, transgressed beyond the scope of simple mitigation testimony into abstract, theological questions regarding the hallowed role of the prosecutor as a vehicle of divine retribution and the propriety of capital punishment. Although the prosecutor may have legitimately probed into the sincerity of Mr. Farina's new-found faith or into Rev. Davis' background or credentials, his use of a witness to recite scripture that complemented the prosecutor's own homily (and call for divine judgment) was constitutionally improper. The Florida Supreme Court found that the "prosecutor's conduct is less egregious because it occurred during cross-examination and not during argument to the jury," *Farina III*, 937 So. 2d at 633, but evidence brought out during cross-examination can be just as powerful— sometimes even more so—than evidence presented during direct examination.

"In evaluating the prejudicial effect of the prosecutor's argument . . . the uncorrected suggestion that the responsibility for any ultimate determination of death will rest [elsewhere] presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Caldwell*, 472 U.S. at 332-33. The way in which the prosecutor religious theme so permeated the totality of the proceedings would reasonably lead a jury to abdicate its decision-making role in favor of a penalty ostensibly sanctioned by the petitioner's own faith. *See id.* 328-29 ("we conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").

Prejudice follows inextricably where "a prosecutor [ ] mislead[s] a jury by quoting scripture for the proposition that a higher authority mandates death for murderers." *Shere*, 537 F.3d at 1310. The only question before the jury rested upon a binary choice:  a sentence of life imprisonment or death. The prosecutor's calculated approach, including an instruction that a juror's religious beliefs should supersede the court's instructions, indoctrinated the jury to a principle at odds with Mr. Farina's constitutional rights. It is apparent to us that the prosecutor's pervasive misconduct infected the foundations of Mr. Farina's proceeding. The prejudicial and infectious nature of the prosecutor's conduct is also demonstrated,

under *Romine*, because (1) the trial court found three statutory and 15 non-statutory mitigating factors and five statutory aggravating factors, and (2) Mr. Farina was not the trigger-man. *See Romine*, 253 F.3d at 1370 ("Of course, the relative strength of the aggravating and mitigating circumstances is an important factor to be considered in deciding whether there is a reasonable probability that but for the improper argument the result might have been different."). *See also* Ex. F-30 at 2631 (trial court explaining during final sentencing that "this is probably the most difficult case I've had to make a decision on"). Therefore, the prosecutor's improper use of Biblical reference to proclaim death as the only viable punishment—mandated by the divine—so diminished the jury's decision-making ability to render the proceedings unfair and unjustly prejudicial to Mr. Farina.

There is a reasonable probability that a claim of such pervasive misconduct by the prosecutor, though raised for the first time on appeal, would have swayed an appellate court to grant relief to Mr. Farina in the form of a new sentencing hearing. The nature and timing of the message and its unremitting delivery diminished the jurors' sense of responsibility and consideration of mercy. It is by more than a mere "reasonable probability" that, but for counsel's unprofessional errors, the result of the [appeal] would have been different." *Strickland*, 466 U.S. at 694.

### 2.    Deficient Performance

35

It has long been recognized that prosecutorial misconduct may be grounds for reversal. *See Berger v. United States*, 295 U.S. 78 (1934). "Part of this recognition stems from a systemic belief that a prosecutor, while an advocate, is also a public servant 'whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Brooks*, 762 F.2d at 1399 (citing *Berger*, 295 U.S. at 88). Judicial antipathy to such misconduct follows from its likely influence on a jury:

> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge, are apt to carry much weight against the accused when they should properly carry none.

*Berger*, 295 U.S. at 88.  Our review of such misconduct "must be informed by an awareness that the prosecutorial mantle of authority can intensify the effect on the jury of any misconduct." *Brooks*, 762 F.2d at 1399.

The prosecutor's invocation of divine law as an ascendant doctrine violated the Eighth Amendment principle that the death penalty may only be imposed when the jury is given "clear and objective standards" by which to reach a verdict. *Godfrey v. Georgia,* 446 U.S. 420, 428 (1980) (holding that capital sentencing statutes must "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death") (internal citations and quotation

36

marks omitted). Moreover, the prosecutor's advocation that the jury forego the court's instructions and, instead, obey one's own religious beliefs creates fundamental doubts to the verdict's legitimacy. *See Chandler v. Florida,* 449 U.S. 560, 574 (1981) ("Trial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law."). Similarly, any suggestion that the jury may base its decision on a "higher law" than that of the court in which it sits is forbidden. *See, e.g.*, *Jones v. Kemp*, 706 F. Supp. 1534, 1558-59 (N.D. Ga. 1989) ("A search for the command of extrajudicial 'law' from any source other than the trial judge, no matter how well intentioned, is not permitted."); *Commonwealth v. Chambers*, 599 A.2d 630, 644 (Pa. 1991) ("Our courts are not ecclesiastical courts and, therefore, there is no reason to refer to religious rules or commandments to support the imposition of a death penalty."). The Supreme Court has consistently held that the Eighth Amendment and the Due Process Clause require that jurors be allowed to meaningfully consider mitigation, to render their verdict under the guidance of a carefully drawn statute, to consider mercy, to understand that the imposition of a death sentence is never mandatory, and to accept full responsibility for the weight of their decision. *See Godfrey*, 446 U.S. at 428; *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (plurality opinion); *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality opinion).

"[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29. Telling a capital jury to disregard mitigation evidence because the jury must submit itself to the authorities of God violates the principles established in *Lockett v. Ohio*. *See also Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987) ("in capital cases, the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence.") (internal quotation marks omitted).

We recognize that our review of counsel's performance is deferential under *Strickland* and that an appellate lawyer is not required or expected to raise all plausible claims on appeal. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000). But in this case, appellate counsel's failure to raise the prosecutorial conduct claim fell below the standard of competence required by the Constitution. The blatant misconduct here, which so infected critical aspects of a capital sentencing proceeding, was below the minimal level of performance we demand from appellate counsel and violates *Strickland*. *See Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (finding appellate counsel's failure to raise issue on appeal regarding improper comments made during direct examination and closing argument, even though not expressly raised in district court, constituted ineffective

assistance of counsel where the improper comments were "obvious on the record, and must have leaped out upon even a casual reading of [the] transcript").

Furthermore, the fact that such prosecutorial misconduct could lead to potential constitutional violations was well established at the time. The Florida Supreme has repeatedly "condemned the invocation of religious authority in capital sentencing proceedings," *Farina III*, 937 So. 2d at 629, and noted that the prosecutor's questions to Rev. Davis in this case "were objectionable and could possibly have resulted in reversal of the conviction," *id.* at 632. Notwithstanding that appellate counsel did raise other issues on appeal, because the issue of prosecutorial misconduct was substantial, potentially meritorious, and so obvious on the record, counsel's performance was deficient. Furthermore, because there is clearly a reasonable probability that the prosecutorial misconduct claim would have been successful on appeal, we conclude that appellate counsel's deficient performance prejudiced Mr. Farina.

## IV. Conclusion

We reverse the district court's denial of habeas corpus relief and direct the district court to order the State to grant Mr. Farina a new resentencing hearing within a reasonable period of time.

**REVERSED IN PART, VACATED, AND REMANDED.**